In the Matter of George B. PARR,
Bankrupt.

No. 587.

United States District Court
S. D. Texas,
Corpus Christi Division.

May 31, 1962.

Louis F. Oberdorfer and Homer R. Miller, Dept. of Justice, Washington, D. C., Woodrow Seals, U. S. Atty., and John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., for petitioner, the United States.

Oscar Spitz, Corpus Christi, Tex., for George Clower, trustee in bankruptcy.

Wright Matthews, Dallas, Tex., for Mrs. Thelma Parr, creditor.

INGRAHAM, District Judge.

The case is before the court upon the petition of the United States of America for review of an order of the Referee in Bankruptcy disallowing claims of petitioner for Federal Income Tax.

The petitioner, the United States of America, will be hereinafter referred to as "United States", "petitioner" or "government". The bankrupt, George B. Parr, will be referred to as "Parr" or "bankrupt".

This court is bound to accept the referee's findings and conclusions unless they are clearly erroneous. Gen. Order 47, pursuant to 11 U.S.C.A. § 53. Adhering to the scheme used by the referee, this court will separate the government's claims into six categories, viz:

I. 1945 & 1947 Issues,
II. 1949 Issue,
III. 1950 Issue,
IV. 1949–50–51 BISD Issues,
V. 1952 Issue, and
VI. 1953 Issue,

and consider them serially.

## I. 1945 & 1947 ISSUES.

The government claims that bankrupt received $500,000 in 1945, and $162,000 in 1947, which he fraudulently failed to report as income. The referee found that bankrupt received these sums as the proceeds of bona fide loans which he was unconditionally obligated to repay, and that, therefore, he committed no fraud in failing to report these items as taxable income.

■ The key issues are whether or not these sums, however obtained, were taxable; and if taxable, whether or not the government has presented clear and convincing proof that bankrupt committed fraud in failing to pay taxes on these sums. Although proof of fraud in a bankruptcy proceeding will not entitle the government to collect 50% fraud penalties (Simonson v. Granquist, 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962)), assessment was not made until 1954, and the claims are barred by the statute of limitation unless the government can prove that the monies were fraudulently omitted from bankrupt's return. Because this court is persuaded that under no interpretation of the facts and applicable law can the government establish a right to the assessed taxes, a full review of the referee's findings and conclusions, to which the government has issued challenge, will not be undertaken.

■ Clearly, if these sums represented loans, as found by the referee, no tax is owing. But this court is convinced with the government that the referee's findings were clearly erroneous, and that the monies were illegally obtained with no intention on the part of the bankrupt of ever repaying them. They were not bona fide, arm's length transactions.

Bankrupt received the $500,000, in 1945, and the $162,000, in 1947, from the Duval County Road and Bridge Fund. Most of the $500,000 was used to purchase the 56,000 acre Dobie Ranch, located in LaSalle and Webb Counties, and to make improvements thereon. The $162,000 was used to satisfy a tax obligation incurred prior to 1945. There is no question but that bankrupt wanted to create the impression that the sums were received as loans. After acquiring the $500,000, bankrupt had five first mortgage Bearer Bonds and a Deed of Trust prepared. The Bonds provided for 1% interest, and were due in three years. In 1948, renewal Bonds and Deed of Trust were executed, covering both amounts, at the same rate of interest and due in 10 years. In 1948, a $10,000 token payment of principal, along with a payment of $18,240 on accrued interest, was made to the County. But viewing the evidence in its entirety, these actions on the part of the bankrupt are revealed to be nothing more than diversion tactics to draw attention away from the true illegal nature of the transactions.

Nothing spread upon the public records of Duval County acknowledges that there were loans made to bankrupt in 1945 or 1947. The $500,000 was abstracted from the Road and Bridge Fund with two $250,000 warrants drawn to the Wilder Construction Company (a defunct proprietorship owned by the bankrupt), with the warrants reciting that they were paid in allowance of claims by that company. In fact, the company had no claims against the County at that time. Subsequently, bankrupt withdrew the money from the Wilder account and deposited it to his own name. This diversion was a part of the whole scheme to defraud. Two members of the County Commissioners Court at the time these transactions were alleged to have taken place testified that they had no knowledge of any loans being made by the County to bankrupt. Further, such a loan is clearly prohibited by Art. III, Sec. 52 of the Texas Constitution, Vernon's Ann.St., which forbids a political subdivision of the state to lend its credit or grant its public money or things of value to any individual, association or corporation. When the county brought suit against the bankrupt in state court to recover back these funds, they pursued their remedy on a theory of a trust *ex maleficio,* which is inconsistent with a finding that these were loan transactions.

Although there was testimony that the 1945 Deed of Trust and the 1947 renewal Deed of Trust were duly acknowledged by bankrupt and respectively delivered to the County Clerk and the County Auditor of Duval County, neither Deed was ever recorded, either in Duval County or in LaSalle or Webb County where the property was located. Nor does it appear that the original Bearer Bonds were ever outside the bankrupt's dominion and control. It was testified that the renewal Bonds were delivered to the Duval County Auditor, but to this day they remain unfound. Nothing in the bankrupt's financial records ever revealed that there was a debt owing to the County. Instead, the transactions were set up on bankrupt's books to show a mortgage payable obligation given to secure the purchase of the Dobie Ranch. After obtaining the funds, the bankrupt filed two financial statements with a bank, *omitting entirely any reference to liability to Duval County or anyone else on account of these withdrawals*. In short, bankrupt attempted to weave a tangled web of deception about these transactions, which is readily brushed aside to expose their inherent illegality. Parr, being in a position to do so, simply helped himself to the money.

Turning to the legal issues of taxability, Section 22(a) of the 1939 Code, 26 U.S.C.A. § 22(a), which is relevant to the years in question, defines gross income as including "gains * * * of whatever kind and in whatever form paid." There is no proviso that the gains must have been legally obtained, and indeed there has been no such limitation in our tax laws since the time of the 1916 amendment of Section II B, of the Income Tax Act of 1913, to allow the taxation of gains from unlawful as well as lawful businesses. Without other guide, it would appear that Congress intended to exercise fully its power under the Sixteenth Amendment to tax incomes, "from whatever source derived," and that the monies involved in the present dispute, not being valid loans, were taxable; and that fraud might now be shown to establish the validity of the 1954 assessment. But, by excising the "claim of right" doctrine from its original context as a test for determining *when* receipts constituted taxable income (See North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197 (1932)), and applying it to determine *whether* receipts should be taxable as income, the Supreme Court, in Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946), significantly limited the types of ill-gotten gains subject to taxation. In February 1946, before either of the returns in question were filed, the Court, in the Wilcox case, held "that a taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. Without some bona fide legal or equitable claim, even though it be contingent or contested in nature, the taxpayer cannot be said to have received any gain or profit within the reach of § 22(a)." Even before the Supreme Court's decision in Wilcox, the Fifth Circuit, in McKnight v. Commissioner, 127 F.2d 572 (1942), reached the same conclusion for substantially the same reasons. Although the facts in both the Wilcox and McKnight cases concerned embezzlement, the doctrine announced was patently applicable to various other forms of illegally received income. Thus, because bankrupt had no claim of right to the monies taken from Duval County, it could not be said that the funds were taxable so long as the rationale of Wilcox remained the law.

After the Wilcox decision, the lower courts almost immediately began to confine its rationale (See, e. g., Akers v. Scofield, 167 F.2d 718 (5th Cir. 1948)), and in 1952, the Supreme Court explicitly limited it to its facts by refusing to extend it to deny taxability of extorted funds. Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833. Implicitly, it would seem Rutkin rejected the Wilcox rationale in toto in that the absence of a "claim of right" was as much

a part of Rutkin as of Wilcox. The test of taxability applied in Rutkin was that "an unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Thus, at this point, the test of Rutkin would reach back to the years in question to make the monies received from Duval County taxable to bankrupt, since no argument can be made that bankrupt embezzled these funds inasmuch as he was not an employee of the County at the time of receipt; and it would appear that the test for taxability in all cases except embezzlement would be the Rutkin rationale.

Finally, the Supreme Court cut away the remaining vestiges of the Wilcox rationale, in a fashion which is significant to the government's present attempt to prove fraud. Acknowledging the irreconcilability of Rutkin and Wilcox, the Court overruled Wilcox and held embezzled income subject to taxation. James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). But even though the Court held that embezzled funds were taxable, nevertheless it reversed a criminal conviction for "willfully" failing to report embezzled funds as income, on the grounds that the defendant/petitioner had a right to rely on Wilcox in not reporting the income. Thus, it limited the effect of its overruling decision to prospective application only. See generally, Note, 38 Texas L.Rev. 649 (1960). (Reliance on Wilcox was not a consideration in the Rutkin case since there the money had been extorted prior to the promulgation of the Wilcox doctrine.)

■■■ Having determined that the monies received by bankrupt in 1945 and 1947 from the Duval County Road and Bridge Fund are subject to taxation, it is now necessary to decide whether or not bankrupt committed fraud in not reporting them as income. Two coordinate facts must be established before the legal conclusion of tax fraud can be drawn, viz: (1) a tax must have been

owing, and (2) the bankrupt must have failed to pay the tax believing it to be owing, with the specific intention of cheating or deceiving the government. See generally, 10 Merten Law of Federal Income Taxation, Sec. 55.10. Viewed hypothetically, if a tax was owing, but the taxpayer was in good faith in failing to pay it, fraud could not be established. Conversely, if the taxpayer deliberately and with bad faith failed to pay a tax believed to be owing, when in fact no tax was owing, there would likewise be no basis for establishing fraud. In the instant case, no tax was owing at the time bankrupt illegally obtained these funds, since he had no "claim of right" as per Wilcox. But after Rutkin became the law, assuming limitation had not run, the government would have been justified in assessing taxes against bankrupt. But the bar to present taxation is this: accepting without deciding that the government is correct in saying that the bankrupt failed to pay taxes believed to be owing, nevertheless, when fraud is an essential element of the proof, the taxes must have been owing at the time bankrupt thought he was evading them. A subsequent change in the law from non-taxability to taxability, as here, cannot be cast back to conjoin with bankrupt's evil intention (assuming he had such an intention) to perfect the basis for showing fraud. The Court's reasoning in the James case, supra, that "the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed," applies with equal logic to the instant case, since the proof of fraud in a civil action is in parity with the proof of willful evasion in a criminal prosecution. In short, whatever bankrupt's state of mind in 1945 or 1947 (or 1946 and 1948, when returns were timely filed), and whatever the present status of the law, he cannot now be deemed to have fraudulently evaded the payment of taxes when he was entitled to

rely on a law holding his illegally obtained income not subject to taxation. The fact that Wilcox *was* the law during the tax years in question is sufficient to bar the government from now proving fraud, insofar as the bankrupt is entitled to the ancient presumption of knowing the law. Macias v. Commissioner, 255 F.2d 23, 28 (7th Cir. 1958).

## II. 1949 ISSUE.

The government claims that bankrupt failed to report $25,000 income in 1949. The referee found that bankrupt received a $25,000 loan from monies in the Duval County Road and Bridge Fund, which was authorized by resolution of the County Commissioners Court. The resolution (signed by two Commissioners, plus the bankrupt in his capacity as County Judge) purported to set up an unsecured loan at 3% interest, and due in five years. In fact the sum was paid back to the County in five years, with 3% interest. Bankrupt sought to deduct this interest payment of $3,750 from his 1954 return, but the deduction was disallowed. The referee found that the Commissioner erroneously disallowed this deduction. Although such a loan would fall within the prohibition of Art. III, Sec. 52 of the Texas Constitution, as previously discussed, it is unnecessary for this court to determine if the referee's findings were clearly erroneous, for the same reasons given in the discussion of fraud under I above; if the bankrupt received this money as illegal income, he had a right to rely on the "claim of right" doctrine in not reporting it for taxation.

## III. 1950 ISSUE.

The government claims that bankrupt received $1,500 in unreported income in 1950, which he obtained from unexplained sources. This sum was used to purchase an automobile for bankrupt's daughter. The referee found that bankrupt had previously reported said sum as taxable income and had paid taxes thereon; that the cash used to purchase the automobile had been previously withdrawn by the bankrupt from his bank account. This conclusion finds support in the testimony of bankrupt and Benight, accountant for the trustee, and cannot be said to be clearly erroneous.

## IV. 1949–50–51 BISD ISSUES.

The government claims that bankrupt illegally received monies from the Benavides Independent School District (BISD) which he failed to report as income, in the amount of $20,782.92 in 1949, $41,515.30 in 1950, and $26,015.55 in 1951. This claim is based on a number of checks made to fictitious payees and drawn on the BISD. These checks were made and signed by Diego Heras, the acting Secretary of the BISD, and from July 1950 until July 1951 they were countersigned by Parr. The defense to this claim is that the bankrupt never received any of the proceeds from these checks. There is no dispute that the monies were illegally obtained from the BISD through the agency of checks made to fictitious payees; the dispute is whether Parr was the recipient. Heras testified that the fictitious checks were drawn at the direction of Parr, and that he, Heras, personally cashed the checks and delivered the proceeds to Parr. The referee gave no weight to Heras's testimony, gave full credence to Parr's, and found that bankrupt never received any money from the BISD.

The government must prove fraud before it can perfect its 1958 assessment against the sums it alleges the bankrupt received and did not report in 1949 and 1950. Deficiency notice of additional taxes owed for 1951 was issued in the early part of 1955, making 1951 an open year, with no necessity for the government to prove fraud, and with the burden of proof on the trustee to show that the bankrupt did not receive income which he failed to report.

There is no question that any monies received by bankrupt from the BISD in 1951 would be taxable to him on the authority of Rutkin v. United States, discussed supra. The Rutkin decision, making "economic benefit," rather than "claim of right," the test of taxa-

bility for monies illegally received by means other than embezzlement, was promulgated on March 26, 1952, with no limitation placed on its retroactive effect. As such, though bankrupt may have been entitled to rely on Wilcox, supra, if he received and did not report illegal income on his return for 1951, filed March 17, 1952, as of the date of the Rutkin decision, it would seem he at least had a moral obligation to file an amended return. Even if there was no moral or legal responsibility on the bankrupt's part to file an amended return (again, assuming the fact that he received illegal income which he failed to report), it is clear that the government could reach unreported illegal income through a timely assessment, as in the instant case.

Regarding the illegal income allegedly received by bankrupt from the BISD in 1949 and 1950, where the government must prove fraud as well as receipt, even though the reach of the Rutkin decision would extend back to make illegal income received in those years taxable, this fact is of no aid to the government in establishing fraud. By the same reasoning detailed in reference to the 1945 and 1947 issues, supra, the government is effectively barred from proving fraud on the part of the bankrupt in 1949 and 1950, since the bankrupt would have had no "claim of right," as per Wilcox, to illegal income received in those years, and hence, no duty to report such sums for taxation. A fortiori, bankrupt cannot now be shown to have committed fraud in failing to do what the law held he had no duty to do.

Even though the government is foreclosed from proving fraud and thus reaching illegal income which might have been received by the bankrupt in 1949 and 1950, the events of those years are inextricably interwoven with the events of 1951; and testimony and evidence relating to all three years (as well as years subsequent to 1951) will be reviewed in determining whether or not the referee's findings and conclusions, that the trustee had satisfied his burden of proving that the bankrupt never received any illegal income from the BISD, were clearly erroneous.

Undisputed evidence shows that from 1939 until 1951 Diego Heras was employed by the BISD as Deputy Tax Collector, and acting Secretary. In his capacity as acting Secretary of the BISD— which encompassed a substantial portion of Duval County and operated a school at Freer and Benavides—Heras prepared and signed checks on the BISD funds on deposit in the Texas State Bank at Alice, Texas, from sometime prior to 1946 until July 1951.[1] Until June 1950, the BISD checks were all countersigned by W. M. Benson, Auditor of the BISD, or by Mrs. Ocie McCoy, an employee of Benson. In June 1950, Benson's employment was terminated; thereafter Parr countersigned the BISD checks. At no time did Parr ever hold any official position with, or receive any salary from, the BISD. The depository of the School District funds was the Texas State Bank of Alice, of which Parr was the President. The books and records of the School District were kept in the BISD office in the Parr Building, in San Diego, Texas, which was outside the territory of the BISD. After Benson's employment as Auditor was terminated, Parr was in charge of the School District office, countersigned BISD checks, and was Heras's immediate supervisor until Heras ceased to be Secretary in 1951.

Heras testified for the government that he prepared numerous fictitious checks from lists given him by Parr (Govt. Ex. 126–141), which he signed, endorsed by writing the name of the fictitious payee on the back, and which were countersigned by Parr. After preparing a batch of fictitious checks, Heras would then drive to the Texas State Bank in

---

1. In July 1951, Heras was removed from his position as Acting Secretary, and was transferred from San Diego to Benavides, where he served for a time solely as Deputy Tax Collector for the BISD. There is no evidence that Heras ever wrote or signed any BISD checks after he moved to Benavides.

Alice, cash the checks, receive the cash in an envelope, and deliver the money to Parr (Tr. 496). Heras stated that the checks were prepared in accordance with a list of handwritten names and figures given him by Parr. According to Heras, Parr instructed him to take the bogus checks to one Donald, Cashier at the Bank (Tr. 500). He took them to Donald when he was available, but on several occasions he took checks to Carl Williams and to Edna Fitch (Tr. 501).

Certain of the fictitious checks written in 1951 were introduced in evidence. The court can only speculate as to what became of the remainder of the fictitious checks. Heras expressed the belief that they were destroyed or lost in transit when the records of the BISD were moved to Benavides (Tr. 502, 504–505). However, the witness was able to prepare a list of checks payable to fictitious persons, and given for fictitious services or materials in the years 1949, 1950 and 1951, by examining Government Exhibits 102, 103 and 104—annual reports of school funds of the BISD. The witness stated he delivered all of the proceeds of the fictitious checks to Parr, except on a few occasions when Parr directed him to deliver the money to D. C. Chapa (Tr. 660–661, 663–664).

On cross-examination, Heras admitted that he had been granted immunity from prosecution by the state (Tr. 718); that he had once made a partially false affidavit implicating an F.B.I. agent (Tr. 725–726; Trustee's Ex. 43). He also admitted that more money had been deposited in his bank account in 1949, 1950 and 1951 than his salary amounted to, but he claimed the money deposited in his name represented, inter alia, advances by other people, and money entrusted to him for various purposes (Tr. 770–771, 778, 1103–1104). He admitted buying an automobile in 1949, but he did not remember how much he paid for it (Tr. 841). He admitted drinking in saloons, mostly by himself but sometimes with the "boys" in the evenings. He denied that the bankrupt ever gave him any checks countersigned in blank (Tr. 873). The trustee, in Volume II of his brief, has placed great stress on the fact that, although the witness appeared to fix the time when the first fictitious checks were written as 1948 (Tr. 691–692), on cross-examination he was confronted with the fact that a great many bogus checks had been written by him in 1946 and 1947 (Tr. 815–817). Heras explained this by testifying that he thought the line of questioning pursued by trustee's counsel (where he fixed the starting point as 1948) referred to checks prepared at the direction of the bankrupt, whereas the 1946 and 1947 checks had been prepared at the instruction of D. C. Chapa, Parr's "right-hand man", and had not been cashed by Heras, or the receipts delivered by him to the bankrupt (Tr. 1098–1100). Heras admitted that certain checks— mainly payroll checks—had been altered and raised in amount, but he denied having anything to do with this.

Government's Exhibit 190, an annual report of the BISD for 1952, revealed that after Heras left the School District, fictitious checks continued to be written, which were countersigned by Parr (Tr. 1130).

Counsel for the Trustee stipulated that the checks listed in the exhibits identified by Heras and referred to in his testimony were fictitious (Tr. 980). Three of the checks had been made payable to existent persons, but these three persons testified that they had never received the checks, furnished any materials, or performed any services for the BISD (Tr. 630–631, 632–635, 635–638).

B. F. Donald, Jr.—the individual to whom Heras had taken most of the fictitious checks to be cashed—was the Cashier of the Texas State Bank. As such, he did not occupy a teller's cage, and whenever Heras presented checks to him to be cashed, he would have to deliver them to a teller who, in turn, cashed them. Christine Ray, a teller in the bank during the years in question, testified that Donald would bring her batches of BISD checks to be cashed, and that she would deliver the money to Donald (Tr. 523–525).

Mrs. Edna Fitch, a teller in the bank during part of the period in question, testified that Heras frequently came into the bank with checks and entered Donald's office by the back door. On one occasion when Heras had presented a batch of checks to Mrs. Fitch to be cashed, she shortchanged him $1,000. A short time later, Heras discovered the error and returned to the bank. According to Mrs. Fitch, Heras appeared very frightened and upset upon his return, (Tr. 556), when he told her that "George was waiting for the money." (Tr. 554). *Mrs. Ray corroborated the testimony of Mrs. Fitch as to this occurrence,* although she did not hear what was said to Mrs. Fitch by Heras (Tr. 528). Mrs. Fitch testified she thought the incident was humorous at the time, but when she later laughed and told Donald about it, he apparently did not consider it a laughing matter. In the words of Mrs. Fitch: "I told him (Donald) that I had shortchanged Diego and when I saw George (the bankrupt), I was going to tell him about it and laugh. I was laughing about it. I thought it was funny. And Mr. Donald told me 'I wouldn't, if I were you'." (Tr. 558; explanation added). On cross-examination, Mrs. Fitch further testified that shortly after the above incident, Donald tried to get her to resign from the bank, without giving her any reason, and told her to go see Parr (Tr. 572-573).

Prior to this incident, Mrs. Fitch had been instructed by Donald to cash all BISD checks, and not to put on the teller's stamp if they were not endorsed. These instructions related to the BISD checks only, and were contrary to banking practice (Tr. 555-556).

W. M. Benson testified that in the fall of 1948, Heras brought him a batch of checks written on the BISD account, with payees whose identities were not known to the witness, and asked him to countersign and cash these checks and give the money to Parr. Benson took the checks to Donald, who told him to come back in about 15 minutes. When Benson returned, Donald gave him an envelope, which he turned over to Parr (Tr. 1011-1014). Parr, when asked what the envelope contained, told the witness: "Well, don't—don't need to bother about that, that is not income to me, it is just money for political expenses." (Tr. 1014). Counsel for the trustee did not cross-examine Benson on this matter.

The substance of the trustee's answer to the above testimony consists of an attack on Heras's character in general, and his testimony in particular, and a blanket denial by the bankrupt that he ever received any of the money in question.

Eusebio Carrillo, Jr., once a good friend of Heras's, testified for the trustee that Heras induced him to sign a false affidavit against Parr (Tr. 1523, 1525). He further testified that Heras carried large sums of money around with him, which he frequently spent in taverns and beer halls (Tr. 1527-1530). Also, the witness testified that Heras boasted, during the period in question, that he could imitate anyone's signature. On cross-examination, the witness admitted that he was D. C. Chapa's brother (Tr. 1556). The witness explained the difference in last names by saying that his brother preferred to use their mother's last name, while he used their father's last name. He further admitted that he had turned the purportedly false affidavit over to Parr when he got mad at Heras (Tr. 1564), and that shortly thereafter, he rejoined Parr's political party, and was able to get a substantial loan through one of Parr's banks when no other bank would lend him the money (Tr. 1570, 1565). In addition, although Heras had testified in previous trials about Parr's connection with the bogus BISD checks, and in fact, had undergone five days of cross-examination on this matter in a previous criminal trial, the testimony of Carrillo had never before been used in behalf of Parr (Tr. 1574, 1580).

Mrs. Barbara Gonzales, former manager of the school cafeteria, testified for the trustee that on several occasions she had seen checks on Heras's desk which were blank except for Parr's signature (Tr. 1537-1540). On cross-examination,

the witness admitted that she was a member of Parr's political party, was an old friend of Parr's, and had testified in his behalf in other cases (Tr. 1543). Although she testified she had seen as many as 20 blank checks in a row, she did not deny that in the prior criminal proceeding where the bankrupt had been charged with mail fraud, she had testified to seeing only two or three blank checks in a row (Tr. 1541–1542). The witness denied that she had been fired from her job as manager of the cafeteria for refusing to serve children whose parents were members of the political party in opposition to Parr's. As she explained it, she treated all the children alike, because she did not consider them to blame for their parents' faults (Tr. 1544). On re-direct, the witness testified that she would not lie to the court, and that the signature she saw on the blank checks was "George B. Parr". (Tr. 1547–1548). On re-cross, when confronted with the fact that none of the fictitious checks were signed "George", but were signed "G. B. Parr", she decided that what she had really seen was the latter signature. (Tr. 1548).

Mrs. Maria Barkley, at one time a temporary employee of the BISD, testified to seeing Parr sign blank BISD checks, which he then handed to Heras (Tr. 1591–1594). She further testified that Heras had a Spanish nickname which means "drunkard". On cross-examination, she admitted that among the "Latin people", anybody who drinks quite a bit is called a drunkard (Tr. 1603). The witness further admitted that she had worked for Parr, that her family had worked for his nephew, and that she belonged to Parr's political party (Tr. 1602).

The bankrupt was called as a witness by the trustee. He testified that after he began counter-signing checks (following the termination of Benson's services, and at the request of one Delaney, a member of the School Board and a business partner of Parr in the Parr-Delaney Oil Company), Heras would bring the payroll to the witness's office and he would "automatically" sign it (Tr. 1619). Bankrupt stated that Heras would bring him other expense accounts, and present checks for signature which had not been signed, but which the witness signed anyway, turning them over to Heras. Although bankrupt stated the checks were sometimes blank, he considered his duty was merely to sign them; he never looked at the checks carefully (Tr. 1620–1621). He said he was a busy man with numerous business and other interests; in his words: "I liked to fool with quarter horses, and I guess I run around a little bit, and play poker, one thing and another, and I just didn't have time for it." (Tr. 1622). The witness testified he began counter-signing checks in 1950 when Benson quit, and he stopped counter-signing them in October or November 1951 (Tr. 1624).

Bankrupt denied receiving any money from Heras as the proceeds of fictitious checks. When asked if he had received any of this money, he replied: "Not to my knowledge, no sir." (Tr. 1627). He further denied ever giving lists of fictitious names to Heras, or directing him to take fictitious checks to the bank and cash them, or receiving any money from the checks from anyone (Tr. 1628). Bankrupt also disputed the testimony of Benson, that Benson had given him an envelope from the bank, which the bankrupt had told Benson not to worry about. (Tr. 1721–1722).

On cross-examination, bankrupt stated he was president of the Texas State Bank of Alice, the depository bank of the BISD, and that his brother was the active manager of the bank; that he was in the oil business, and the automobile dealership business; that he had formerly been engaged in the construction business, and had done work under contract with Duval County; and that he had attended law school, passed the bar, and practiced some law. He admitted that he had been convicted of conspiracy to use the mails to defraud, in a case in which the BISD checks were in issue, and was under sentence to prison in that

case.[2] Bankrupt also admitted that he had been convicted of tax evasion many years ago.

Although the witness did not live in the school district, was not a voter in the district, and had never been elected to any position in the district, he testified that he knew many people in the county (in which the school district was located), was very active in county politics (Tr. 1632), and that the members and officers of the School Board were good friends of his and belonged to the same political party. (Tr. 1672). Even so, he denied that he knew anything about whether or not the work or materials listed on the fictitious checks had ever been performed or furnished for the school district (Tr. 1706).

Later in the hearing, Special Agent Freeman was called by the government, and testified that a large number of fictitious checks were drawn on the BISD after Heras had ceased writing checks (Tr. 2187–2214). He could not testify who signed the checks because they were missing. The bank microfilm of these checks was also missing (Tr. 2204). (In fact, previous testimony had revealed that a large amount of the bank microfilm dealing with the years in question had mysteriously disappeared.) On cross-examination, he stated that he did not think that the manner in which some of the fictitious checks were prepared—payable to names only slightly different from actual employees of the district—indicated a scheme to fool the bankrupt (Tr. 2212).

After Freeman had completed his testimony, W. Franklin Reed, Superintendent of Freer Schools, testified for the government that subsequent to July 1951 he received numerous payroll checks through his office, for Freer teachers, which were countersigned by the bankrupt (Tr. 2220–2221). The witness also examined Government Exhibits 223, 224 and 225,[3] which listed a number of checks purportedly drawn for materials and services furnished to the Freer schools in the latter part of 1951 and in 1952, and affirmed that the checks were fictitious; the work had not been performed, nor the materials furnished (Tr. 2224–2231). Although counsel for the trustee objected to the testimony of Reed on the grounds that it was not material or relevant, since it referred to events occurring in years other than the ones in which the government had charged bankrupt with failing to pay taxes, he did not cross-examine the witness.

Careful analysis of the above evidence and testimony compels the conclusion that it will not support the referee's findings that the trustee proved that bankrupt did not receive illegal income from the BISD.

Throughout the hearing on this issue, counsel for the trustee sought to establish a negative—that bankrupt did not receive the money—by raising affirmative inferences that it was Heras who received the money. Although Heras testified that he received none of the proceeds from the fictitious checks, some crumbs may have been dropped from

---

2. The criminal conviction was subsequently reversed by the Supreme Court, Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), on the grounds that improper use of the mails had not been proved. However, it is interesting to note that in reference to, inter alia, the bankrupt's connection with the fictitious BISD checks, the Supreme Court stated: "There can be no doubt that the indictment charged and the evidence tended strongly to show that *petitioners devised and practiced a brazen scheme to defraud* by misappropriating, converting and embezzling the District's moneys and property. *Counsel for peti-*

*tioners concede that this is so.*" 363 U.S. at 385, 80 S.Ct. at 1180. (Emphasis added.)

3. Government Exhibit 223 is an extract from the annual report of school funds of BISD for the scholastic year ending August 31, 1952, of certain checks drawn on Freer building fund No. 1 and the Freer local Maintenance Fund for the same year. Government Exhibits 224 and 225 are extracts of certain checks from Government Exhibit 190, charged to the Freer Building Fund No. 1 and the Freer local Maintenance Fund for the fiscal year ending August 31, 1952.

the table. Such would be consonant with the evidence elicited by the trustee of amounts in Heras's bank account in excess of his salary, which amounts nowhere approach the total known to have been stolen. Even if the *undisputed* explanation given by Heras for the excessive amounts in his bank account is totally disregarded, counsel for the trustee has not established his point. Over the three year period in question, more than $88,000 is known to have been stolen from the BISD through the agency of fictitious checks. During the same period, Heras deposited approximately $11,000 over and above his salary and other ordinary income, leaving more than $75,000 unaccounted for if the trustee's inference is accepted that Heras got the money. Surely, it cannot reasonably be inferred that during this three year period Heras spent more than $75,000 while drinking in local saloons.

Accepting as true the testimony that Parr signed BISD checks in blank at the request of Heras (which testimony contradicts Heras and which was given by individuals shown to be highly loyal to Parr), this fact alone does not go to show that the blank checks were eventually made to fictitious payees, or, if made to fictitious payees, that Parr did not receive the proceeds.

Counsel for the trustee made it clear in his argument and in his brief that he considered Heras's credibility completely destroyed when counsel demonstrated that numerous fictitious checks had been written by Heras in 1946 and 1947, while Heras previously repeatedly had testified that the scheme in question was initiated in 1948. Quite the contrary. It is apparent to this court that any discrepancy in the testimony of Heras concerning the date of initiation of the scheme in question was the direct result of human error and counsel's purposeful, devious and misleading line of questioning.[4] Further, Heras's explanation of the apparent inconsistency reinforces his credi-

---

4. In retrospect, it is obvious that from the very inception of his cross-examination of Heras, counsel for the trustee was building toward the disclosure that Heras had written fictitious checks in 1946 and 1947. Although counsel stated several times that he was testing the witness's memory, and to that apparent end asked the witness if he was certain the scheme did not begin in 1950, or some other year subsequent to 1948, he never gave the witness any indication that he was going outside the scope of direct examination, which concerned bankrupt's involvement beginning in 1948. Bearing in mind counsel's concealed objective, it is clear from the record that the witness was trapped into an apparent inconsistency through misleading cross-examination.

At the beginning of cross-examination, counsel for the trustee read from the record of the mail fraud trial where Heras had testified against Parr on the same issues in the previous year (Tr. 691). Heras was told that the record showed he had been asked when the first instance of writing fictitious checks on the BISD had begun, to which he had answered "the latter part of 1948 or the early part of 1949. * * *" Counsel asked him if this was true, to which he replied that he believed that it was. The witness then asked for the opportunity to elaborate a

little bit, but his request was denied, and the court instructed him to answer "yes," or "no." (Tr. 692) The following questions and answers appear in the record:

"Q. Now you wrote the checks, did you not? *Now we are talking about the checks which you say George B. Parr directed you to write—*

"A. Yes, sir.

"Q. *—and brought in on the lists that you say he brought in to you,* and as I recall, the first time, you state that this first started in the latter part of 1948 or the beginning of 1949.

"A. That is what—my belief, yes." (Tr. 702; Emphasis supplied.)

Later, after testifying that bankrupt's involvement with the fictitious checks began in 1948, shortly after an election had been held in the County (Tr. 782–783), counsel for the trustee asked:

"Q. And I think you testified yesterday, Mr. Heras, that the entire scheme of fraudulent fictitious checks started definitely in 1948." (Tr. 783).

The witness, having every reason to assume that this question related to the immediately preceding ones concerning the bankrupt's connection with the scheme, answered in the affirmative. Going further in the record:

"Q: All right. Then, Mr. Heras, as I understand that—lets be sure and lets get

504

bility. If Heras wanted to fabricate a story of bankrupt's involvement ·with these fictitious checks, why would he lie about the date of the scheme's inception in such a fashion as to limit the period of bankrupt's involvement? No explanation was offered by counsel for the trustee, and if Heras was lying about this matter as counsel contends, it is indeed a paradox crying for explanation. It is submitted that the true explanation for the apparent contradiction was that offered by Heras. When Heras was finally given an opportunity to explain his testimony, on redirect examination (Tr. 1095, et seq.), he reaffirmed that the practice of writing fictitious checks from lists given him by the bankrupt, which he cashed and turned the proceeds over to the bankrupt, began in 1948; and that these were the checks he thought he was being questioned about when he testified that the practice began in 1948. On the other hand, the 1946 and 1947 fictitious checks were written by Heras at the direction of D. C. Chapa, and were picked up from Heras by Chapa or one of his employees, or by a Mr. Milligan, Superintendent of Schools (Tr. 1100). Heras further explained that he did not know who received the money from the pre-1948 fictitious checks. Heras had been granted immunity from prosecution; it would have been pointless for him to intentionally lie about such a collateral matter as the date when the practice of writing fictitious checks began. On direct examination, he was asked when the.

our back straight as we start—these fictitious checks, the first of these fictitious checks started, you said, after the election, after one of the elections in 1948?

"A: One of the elections in 1948, yes sir.

"Q: *That is the first time you said that Parr came in with that list to tell you to make up these fictitious checks?*

"A: Yes sir.

"Q: *And that was the first time he ever got any money out of these fictitious checks that you wrote?*

"A: Well, not to my knowledge; *it was about the first time that I knew.*" (Tr. 784–785; Emphasis supplied.)

Both the questions and answers in the above exchange at least implicitly recognize that there were other fictitious checks, but that as far as the witness knew, the first time that the bankrupt had received any of the proceeds of the checks was when Heras began functioning at the bankrupt's direction, in 1948.

Following the above exchange, counsel for the trustee undertook to administer to Heras what he termed his "memory test." (Tr. 787). After giving the witness the impression that he was referring to the list of fictitious checks which had been prepared by Heras for the government (Tr. 794–795), counsel for the trustee read from another list of checks and asked Heras to testify whether or not they were fictitious. Twice, Heras asked to know the date of the checks being read to him, to which counsel for the trustee replied that he did not have the dates; that he only wanted to know if the checks were fictitious (Tr. 807, 808). Between the witness's requests for dates of the checks being read to him, counsel further served to confuse the witness by stating "I think you testified that all of the checks from 1949 *on here* are fictitious * * *" (Tr. 808) (Emphasis. supplied.) The answer given by Heras indicated that he thought counsel was reading from the list of checks prepared by Heras, dealing with the bankrupt's connection, when in fact, counsel was not reading from that list.

Concluding the reading of his list, counsel asked of Heras: "Do you have any confession to make to the court about. your testimony having been true or false, *the testimony that you have given on the stand about these fictitious checks that you say that George Parr had you make up and you gave the money to him?* Do you want to retract any of it before I go on?" (Tr. 813; Emphasis supplied.) The witness answered "No." At that point, counsel revealed to the witness that he had been reading from a list of checks written in 1946 and 1947, which Heras had identified as fictitious. The above excerpts are but representative instances where the witness was led to. believe that the scope of cross-examination was limited to inquiries about the checks he had previously testified he had written at the bankrupt's direction. See, e. g., Tr. 704, 707. Without attempting to. characterize the propriety of counsel's. tactics, it is enough to say that any apparent inconsistency in the witness's testimony was the result of misleading questioning, and it can hardly be concluded that the witness's credibility suffered therefrom.

bankrupt first directed him to make fictitious checks and deliver the proceeds to him, and Heras testified that that was the latter part of 1948. Counsel for the trustee was not able to disprove this testimony.

Heras's story was corroborated in a number of important details by Benson, Ray and Fitch, and was further bolstered by the testimony of Freeman and Reed.

Benson testified in detail about an involved sequence of events in the fall of 1948, when, at the request of Heras, he took a batch of BISD checks, whose payees he did not know, to the bank to be cashed. Benson testified that he delivered the checks to Donald; that he received an envelope from Donald, which he, in turn, gave to the bankrupt. When Benson asked Parr about the envelope, Parr told him the money was not income. It is significant that each step in this process is identic to the procedure which Heras said he followed at Parr's direction, after he had prepared the batch of fictitious checks from the lists given him by Parr. Parr was cross-examined about the events testified to by Benson, and in effect, he claimed that they never happened (Tr. 1720–1726). No reason was proffered by the trustee why Benson would lie about what had happened,[5] (in fact, counsel for the trustee never questioned Parr about this matter on direct examination); the sequence of events was too involved to be a simple matter of confused memory on the part of Benson, who was never even cross-examined on this point by counsel for the trustee.

Fitch was clear in her testimony that when she had shortchanged Heras and he had returned for the remainder of the money, he had told her "George is waiting for the money." It hardly needs to be stated that if Heras was stealing money from the BISD for himself or for the benefit of anyone else other than Parr, virtually from under the nose of Parr, who was counter-signing the BISD checks at this time, Heras would not go into Parr's bank and say that "George is waiting for the money," on checks which were not made out to Parr. There was no reason shown for Fitch to lie about what Heras said. There is no doubt that the shortchanging event occurred; Ray corroborated it, and Fitch had cause to remember it as a result of Heras's unusual nervous and upset state when he returned to the bank, plus the fact that she reported the matter to Donald, in accordance with bank policy. Fitch further served to tighten the ring of incriminating evidence around Parr, when she testified that shortly after the shortchanging event, Donald tried to force her to resign without giving her any reason, and when asked what recourse she had, told her to go and see Parr. If counsel for the trustee had wished to disprove the foregoing exchange between Donald and Fitch, or to correct Fitch's damaging statement that she was fired because she "found out what George was doing," (Tr. 580), he could have called Donald to testify. Donald was available, but counsel for the trustee only called him to testify about another and unrelated matter (see V, infra.); and in fact, out of a record covering 2,215 pages, less than a page and a half was needed to record trustee's direct examination of Donald (Tr. 1826–1827). When government counsel took Donald on cross-examination and attempted to question him on the BISD issues, counsel for the trustee strenuously objected (Tr. 1833–1835), and the government was instructed to limit the scope of their cross-examination to matters raised on direct (Tr. 1837).

The testimony of Freeman and Reed further serves to negate the trustee's inference that Heras was the sole originator and beneficiary of the scheme, and at the same time, to focus attention on Parr's continuing connection with the scheme. Freeman's testimony disclosed that fictitious checks continued to be drawn on the BISD after Heras had been

5. In fact, Benson testified that he had done some income tax work for Parr only a short time prior to these hearings (Tr. 1001).

removed from his check writing position as acting Secretary. And during the period after Heras was no longer acting Secretary, but the writing of fictitious checks continued, the testimony of Reed revealed that Parr was still counter-signing BISD checks.

Parr did not deny that he continued to counter-sign BISD checks after July 1951, when Heras left, but his answers to specific inquiries seemed to shift and float with the prevailing winds. Although Parr originally testified on direct examination that he stopped counter-signing BISD checks in October or November 1951 (Tr. 1624), on cross-examination he later stated that he wasn't certain when he stopped counter-signing BISD checks, and that it may have been as late as 1954. (Tr. 1667). When Parr was asked several times if he had signed any of the post-Heras BISD checks in blank, he answered, each time he was asked, that he did not remember whether he had or not (Tr. 1716). Later, without offering any explanation for his previous testimony, he was unequivocal in stating that some of the post-Heras BISD checks were in blank when brought to him to be signed (Tr. 2174).

After Heras was ousted as acting Secretary, the BISD books and records were moved to Benavides. Thus, for Parr to counter-sign the checks (which were then being signed by Octavio Saenz and O. Carrillo), they had to be transported back to his office in San Diego. Parr's only explanation was that the practice of having him counter-sign the BISD checks was continued "merely as a habit." (Tr. 2175).

Parr testified that he was President of two banks, including the Texas State Bank in Alice, which was the depository of the BISD funds. Until his divorce, in 1949, he was the majority stockholder in the two banks. The Vice President and active manager of the Texas State Bank

was Givens Parr, the bankrupt's brother. The Directors of the Texas State Bank were the bankrupt; his brother; Mrs. Elizabeth Allen Parr, bankrupt's mother; Mrs. B. J. Moffett, bankrupt's sister; and Jesus Olivera, who apparently was not related to the bankrupt (Tr. 1637–1638). In addition, Donald, the Cashier and number three man in the bank after the bankrupt and his brother, often attended Directors' meetings. Even so, Parr claimed to have almost no knowledge of the operations of his own banks, of any unusual dealings that Heras might have had with the Texas State Bank, or of banking practices in general. (Tr. 1658). Apparently, as he testified regarding his responsibility to the BISD, he simply was too busy fooling around with quarter horses, etc, to look into these matters.

Parr's only answer and explanation for the corroborated testimony of Heras was a blanket denial.

▇▇▇ Viewing the foregoing evidence and testimony in the matrix of the trustee's burden of establishing by a preponderance of the evidence that bankrupt received no illegal income from the BISD in 1951, it is this court's carefully considered judgment that the referee's findings and conclusions for the trustee and against the government were clearly erroneous. Other than the blanket denial of the bankrupt, the trustee introduced no direct evidence contradicting the basic thread of Heras's testimony. Although this court clearly recognizes that Heras suffered as a result of the testimony presented by the trustee as attacks on his credibility, this alone does not satisfy the trustee's burden; Heras's testimony that he delivered the proceeds of fictitious checks to the bankrupt was corroborated in several important essentials, while bankrupt's testimony that he never received any of the money was not corroborated.[6] In addition, when the totality of the evidence is considered, Heras's story

6. The testimony of Carrillo, Gonzales and Barkley primarily was offered to attack the credibility of Heras. At most, accepting it as true, it can be said to have corroborated the bankrupt on points which do not establish that he did not receive the money.

is essentially more plausible than bankrupt's, the belief of which would necessarily entail total acceptance of an almost incredibly naive myopia. It is inconceivable that Heras the minor clerk and "Latin" of low station, Heras the drunkard, Heras the bar-fly, could, year after year, bolstered only by his own influence, perpetuate such a continuing fraud before the unseeing eyes of Parr, and through Parr's bank, with all the systematic omissions, commissions and irregularities calling for the continued co-operation of Donald, Williams, Fitch and others; and then to further accept that, after the disengagement of Heras, the engine of fraud continued to chug along on Parr's tracks with new malefactors at the controls. Conceivable or not, it has not been proved, and it was clearly erroneous for the referee to find that the trustee had satisfied his burden. Furthermore, preponderance of the substantial evidence proves receipt of the money by Parr. The prima facie correctness of the government's assessment of additional taxes against the bankrupt for 1951, as augmented by the proof presented in the hearings, will be upheld.

## V. 1952 ISSUE.

Although Parr may have known little about the banking business, he was not unlearned in the more esoteric art of laying on public funds to induce an elected public official of opposing political persuasion to resign from office. As the result of negotiations instigated and conducted by Parr, Daniel U. Garcia, Sheriff of Duval County, nominal business associate of Parr,[7] and political opponent of Parr, agreed to resign from office and not seek reelection, in consideration of the payment of $20,000. Once the arrangements had been made, Garcia resigned, and the $20,000 was siphoned from the Duval County Road and Bridge Fund and

paid over to him. The County Commissioners then appointed Parr Sheriff, and in turn, appointed Dan Tobin, a close political ally of Parr's, County Judge, which office Parr vacated when he became Sheriff.

In 1958 the Commissioner assessed additional taxes against Parr on the grounds that he had received economic benefit from the use of this $20,000. Because assessment was not made within three years, but was made within five years of the date of the return, the government had the burden either of proving fraud, or the omission of income in excess of 25% of the bankrupt's reported gross income.

The referee found that in 1952, bankrupt had not omitted from gross income an amount properly includible therein, which was in excess of 25% of the amount of reported gross income; that the bankrupt had not fraudulently evaded the payment of taxes believed to be owing; and further, that the sum in question did not constitute either actual or constructive income to the bankrupt.

Most of the salient facts are clear and undisputed. Garcia was "bought"; Parr arranged for his purchase. As Parr described the transaction, Garcia "sold himself and we paid him; the county paid him and he got out." (Tr. 1791–1792). Although there is no official record of the event, Parr testified that the payoff was discussed and authorized by the Commissioners Court to be made out of county funds. Whether or not authorized, there is no doubt that public money was used to purchase Garcia.[8] The form of the payment is in dispute: Garcia claims he was paid in cash, which he thought had come from Parr; the trustee presented evidence that Garcia was paid in county warrants which had come di-

---

7. Garcia, Parr and W. C. Johnston were partners in an automobile dealership.

8. Although this fact was not in dispute, the county warrants could not be found; no county records of the money being paid out to Garcia could be found; and the

bank microfilm for the period during which the warrants were cashed had disappeared. However, Parr testified that public money was used to induce Garcia to resign, and the goverment proved that the County Road and Bridge Fund was short $20,000.

rectly from the county without passing through the agency of Parr. In any event, resolution of the conflict would not be dispositive of the issue—the government presented a strong case that the bankrupt derived a *political* benefit from the transaction, but it failed to establish that he derived an *economic* benefit which he fraudulently failed to report for taxation.

The gist of Parr's testimony was that he arranged the payoff of Garcia, not so that he might acquire any personal economic gain, but so that his party— everybody, as he described it, on his side, including the County Commissioners— might benefit politically. Garcia was in the process of forming a political party to oppose Parr's "Old Party", and they wanted him out of power. Parr further testified that the extent of his involvement was to set up the transaction; that he had nothing to do with the payoff after he had presented an account of his negotiations to the Commissioners; that the money never passed through his hands, and that he did not know how the payment to Garcia was actually handled. This testimony was not controverted.

Parr's appointment as Sheriff, when Garcia resigned, benefitted him politically, but no proof was offered that he received an economic gain therefrom. Parr testified that he never received any salary for the six months he served as acting Sheriff. He did admit that he appointed a large number of "special deputies"—perhaps as many as 1,500 "pistoleros" who received a card authorizing them to carry a gun, but no proof was offered that this represented an economic benefit to Parr.

Parr's reported gross income for 1952 was in excess of $124,000. It is patent that $20,000 is less than 25% of this sum.

 Even assuming the government is correct in arguing that the $20,000 was constructive income to Parr, the government failed to offer any proof of fraud. The government's brief presents no argument to support the claim of fraud, and indeed, the record contains no predicate

upon which to base such an argument. A substantial burden was placed upon the government in this respect, in that it had to prove by clear and convincing evidence that the bankrupt knowingly evaded the payment of taxes believed to be owing on constructive income created by the gain of an economic benefit when money passed, either directly or indirectly, from the county to Garcia. This burden was not carried, and thus, the referee's findings and conclusions that Parr was not subject to taxation on the $20,000 payment to Garcia cannot be deemed clearly erroneous.

## VI. 1953 ISSUE.

The government claims that the bankrupt received $85,000 in 1953, from unexplained sources, which he did not report as income. Assessment was made in 1958, and the government contends that they have a present right to collect on their assessment, either on the basis that the bankrupt omitted from gross income an amount properly includible therein, which was in excess of 25% of the amount of reported gross income, or on the basis that the sum was fraudulently omitted from income. The referee found that bankrupt never received the sum of $85,000 from unexplained sources in 1953, as charged by the government, and thus, the assessment was invalid.

The government founded its claim that bankrupt had $85,000 of unreported and unexplained income in 1953 on the records of the San Diego State Bank. These records appear to reflect that on June 22, 1953, and December 30, 1953, the bankrupt brought in the respective sums of $50,000 and 35,000. Specifically, the bank's records show that on June 22, 1953, the Parr Cattle Company (a partnership composed of the bankrupt and his ex-wife) owed the bank $40,000, which was paid, with an accompanying deposit of $10,000 to the cattle company's account. The bank's records further show that on December 30, 1953, the cattle company owed the bank $35,000, which debt it paid on that date.

The records of the Parr Cattle Company, prepared and kept by W. M. Ben-

son, Parr's accountant, present an entirely different picture. These records reflect that on June 22, 1953, the cattle company owed the bank $40,000, and on that date borrowed an additional $10,000, aggregating a total of $50,000 owed to the bank. On August 12, 1953, the company made a $25,000 payment on the indebtedness; it owed the bank $35,000 on December 30, 1953, on which it made payments of $20,500 on January 13, 1954, and $14,500 on January 20, 1954. The referee concluded that the bank records had been falsified, and that the cattle company records evidencing an indebtedness were correct. There was sufficient evidence and testimony to support such findings and conclusions, and thus, no basis exists for this court to hold that they were clearly erroneous.

C. G. Palacios, Executive Vice President and active head of the San Diego State Bank, testified for the trustee that the bank records were incorrect (Tr. 1868–1885). The witness explained that on June 22, 1953, Parr exceeded his $50,000 loan limit when he borrowed an additional $10,000. Aside from the $40,000 indebtedness, the witness testified that Parr was the endorser on a number of notes, which are taken into account in determining whether or not the loan limit has been exceeded. The bank was required to submit its semi-annual report to the Texas State Banking Commission on June 30, 1953, and in order to present a more favorable statement—showing more cash on hand, and concealing the fact that a borrower had been permitted to exceed the loan limit—Palacios treated the $50,000 indebtedness as cash on hand. To that end, he prepared a $50,000 note, and instructed one of his tellers to place it in the vault and record it as currency. As Palacios explained it, he reasoned that he could collect on the note at any time he wanted or needed the money, so he would be safe in treating it as cash on hand.

Palacios further testified that Parr made a partial payment of $25,000 on August 12, 1953. At that time, Palacios made a new note for the $25,000 balance, which he carried on the books as a note. Between August and December of that year, Parr borrowed $5,000 on two occasions, and on December 30, 1953, Palacios testified that he combined the note for $25,000 with the two notes for $5,000, drew up a single note for the total, and had it recorded on the bank's books as $35,000 in currency. Again, this was done to present a favorable picture to the Texas State Banking Commission, to whom the bank had to submit a detailed report on December 31, 1953. According to the witness, the $35,000 debt was paid off in January 1954.

Parr's testimony corroborated the statements made by Palacios that Parr had not made deposits or note payments of $50,000 and $35,000 in June and December of 1953; that instead, he had borrowed money from the bank on the dates testified to by Palacios (Tr. 1956–1963). He further testified that he did not know at the time how the transactions were carried on the bank's books.

Kenneth Bennight, accountant for the trustee, through testimony and graphic evidence, effectively demonstrated that the bank's records were, in all likelihood, incorrect, as previosuly testified to by Palacios (Tr. 1982–2071). Bennight prepared a series of charts and graphs summarizing his analysis of daily currency levels carried in the bank's vault and tellers' cash drawers, from January 1, 1953, to January 31, 1954. The witness demonstrated that, excluding the periods June 22, 1953, to August 12, 1953, and December 30, 1953, to January 20, 1954, the top level of currency maintained on hand by the bank was in the proximity of $70,000, while the ordinary bottom level was in the proximity of $40,000; that when the currency level dropped below $40,000, the bank would order additional currency from its correspondent bank (the Texas State Bank at Alice) to bring the level up to approximately $70,-000.

Bennight demonstrated that during the period June 22, 1953, to August 12, 1953,

the bank records reflected that the normal $70,000 top currency level was exceeded by $50,000. This corresponds with Palacios's testimony that the bank carried Parr's $50,000 note as cash during this period. Bennight further demonstrated that, during this period, the bank continued to order currency from its correspondent bank from time to time. For example, bank records state that, on July 6, 1953, it had $114,000 in currency on hand—$44,000 in excess of the ordinary top level. Further, even though the bank had more currency on hand in denominations of $10 and $20 bills during the period of June 22, 1953, to August 12, 1953, than it had ever maintained before, it continued to order additional $10 and $20 bills. On August 12, 1953, the currency records of the bank indicated that the cash on hand dropped from approximately $94,000 to $44,000. This corresponds with Palacios's testimony that when Parr made a $25,000 payment on that date, he withdrew the $50,000 note he had been carrying as cash, and executed a new note for $25,000, which he properly recorded as a note.

The same type of demonstration as above was made for the period from December 30, 1953, to January 20, 1954. By the use of overlays placed on the graphs which he had prepared, Bennight showed that by eliminating $50,000 during the first period, and $35,000 during the second period, the currency levels would follow a consistent pattern throughout the entire period examined.

■ The above is but a summary of a part of Bennight's presentation, but, when connected with Palacios's testimony, it is enough to indicate that the referee had sufficient evidence to conclude that Parr did not receive $85,000 income from unexplained sources in 1953.

### Conclusion.

The government's assessment of additional income tax for the year 1951 will be sustained and allowed. The claim for all other years will be disallowed.

Counsel will draft and submit judgment accordingly.

