PAUL M. HANSEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hansen v. Commissioner
Docket No. 11617-77.
United States Tax Court
T.C. Memo 1981-98; 1981 Tax Ct. Memo LEXIS 654; 41 T.C.M. (CCH) 1023; T.C.M. (RIA) 81098; February 26, 1981. Gregory M. Hansen and Howard S. Landa, for the petitioner. Stewart C. Walz, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies *656 in petitioner's income tax for the calendar years 1968, 1971 and 1972 in the amounts of $ 2,035.24, $ 6,681.14 and $ 12,734.54, respectively, and additions to tax under section 6653(b), I.R.C. 1954, [1] in the respective amounts of $ 1,017.62, $ 3,340.57 and $ 6,367.27. The determination of the deficiency and addition to tax for the year 1968 resulted from the disallowance of a net operating loss carryback to that year from the year 1971, which carryback loss had previously been allowed by respondent. In his reply brief respondent conceded the deficiency and addition to tax with respect to the year 1972. The issues for decision are: (1) whether there was a deficiency in petitioner's income tax for the calendar year 1971, a part of which was due to fraud, and if not was the loss carryback to 1968 overstated due to fraud; and (2) whether the assessment and collection of deficiencies for the years 1968 and 1971 are barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *657 Petitioner, who resided in Victoria, British Columbia, Canada at the time of the filing of the petition in this case, filed a joint Federal income tax return with his wife on July 12, 1972, with the Internal Revenue Service Center in Ogden, Utah. On this return petitioner showed adjusted gross income of a loss in the amount of $ 16,083.40. Petitioner filed a carryback claim carrying back this loss to the year 1968 and as a result of the carryback claim was allowed a refund of the tax he paid for the year 1968 in the amount of $ 2,035.24. Petitioner filed a joint Federal income tax return with his wife for the taxable year 1968 on May 7, 1969, reporting taxable income of $ 10,332.94. Petitioner is both a lawyer and a certified public accountant. He was admitted to practice law in the State of Utah in 1956 and became a certified public accountant in Utah in 1960. Prior to 1970 and after 1971 petitioner was a professor of accounting at Weber State College, Ogden, Utah. During 1970 and 1971 petitioner took a leave of absence from his position with Weber State College to work in the tax department of Elmer Fox & Company, a CPA firm. The leave of absence was taken by petitioner *658 in order that he might establish an internal tax training program for the employees of Elmer & Company. In 1967 petitioner published a book entitled "1968 Utah Capital Tax Guide as Related to the Internal Revenue Code." Also prior to the years in issue petitioner had served as tax adviser for a number of corporations and businesses and also as a management consultant for businesses and corporations. While petitioner taught at Weber State College he engaged in the practice of law. During 1971 petitioner was a Justice of the Peace and in this capacity received fees for which he was issued a Form W-2 by South Odgen City. Apartment Enterprises (Apartment) was incorporated on September 24, 1970. During 1971, 1972 and the first half of 1973 petitioner was the president of Apartment. During its fiscal years July 1, 1971 to June 30, 1972, and July 1, 1972 to June 30, 1973, Apartment paid petitioner compensation for serving as its president. Petitioner represented Apartment in negotiating the purchase of the Bellevue Estates apartments, the 88th East apartments, the Casino Terrace apartments, the Lynnview apartments, and the Norlang Estates apartments. The agreements to purchase these *659 various apartments were negotiated by Apartment for the benefit of limited partnerships of which Apartment was the general partner and the rights under each agreement were assigned to the partnership which was to own the apartments. These limited partnerships were B & L Partnership Limited (B & L), Norlang Estates Partnership Limited (Norlang), and 88th East & Casino Terrace Partnership (88th East). Apartment participated in the management of the properties acquired by the limited partnerships. The Bellevue Estates apartments and the Lynnview apartments were acquired by B & L, the Norlang Estates apartments were acquired by Norlang, and the 88th East apartments and the Casino Terrace apartments were acquired by 88th East. In March 1971 petitioner and four other individuals organized a partnership named Chateau. There was no written partnership agreement but each of the partners owned an equal interest in the partnership. The partnership was organized to construct, own and operate the Chateau apartments and shortly after its formation began construction of the apartments. Before the end of 1971, Mr. J. Blair Jones, the partner who was actually engaged in supervising the construction *660 of the apartment buildings, withdrew from the partnership. As of December 31, 1971, petitioner and each of the remaining four partners held a 25 percent interest in Chateau. The principal place of business of petitioner and of Apartment during the years here in issue was Ogden, Utah. The apartments owned by B & L were in Seattle, Washington, and the partnership address was Seattle, Washington. The apartments owned by Norlang were in British Columbia, Canada, and the address of that partnership was Vancouver, British Columbia, Canada. The apartments owned by 88th East were also in Seattle, Washington, and this was the address of that partnership. The apartments owned by Chateau were in Centerville, Utah, which is approximately 16 miles from Ogden, Utah. The books of Chateau were maintained in its office of Main Street in Centerville, Utah, near the place the apartments were constructed. During 1971 until Mr. Blair Jones withdrew from the partnership, petitioner would visit the Chateau office two or three days a week and after Mr. Jones withdrew from the partnership he visited the office daily. On occasions he would visit the office more than once in the same day. Apartment *661 was also the general partner and participated in the management of apartment properties of several partnerships other than those heretofore listed. Petitioner's books and records for the year 1971 and the books and records of B & L, Norlang and 88th East were maintained on a cash basis of accounting. Petitioner's income tax returns were filed on a cash basis and the Forms 1065 (U.S. Partnership Return of Income) were filed by the partnerships on a cash basis. In 1971 petitioner had a 1.19 percent interest in the income and loss of Norlang and a 6.616 percent interest in the income and loss of B & L. The contract by which Norlang purchased the Norlang Estates apartments was signed on October 29, 1971. On the first page of the contract it is stated that the contract is made on the 31st day of August 1971. The deed transferring the Norlang Estates apartments to Norlang was recorded on October 29, 1971. The final sales contract for the purchase of the Norlang Estates apartments was drafted by a Canadian attorney. This attorney was given an interim agreement which had been signed by Apartment and Omega Concrete Pumping Co. Ltd. in April 1971. The Agreement entered into between *662 Norlang and Norlang Development Limited the seller of the Norlang Estate apartments, provided in part as follows: 2. The purchase price shall be $ 1,555,000.00 (subject to a discount of $ 50,000.00 as hereinafter referred to). In addition the purchaser shall pay $ 175,000.00 for construction interest, financing points, and all other financing fees incurred by the Seller during the construction of said apartments. Said amounts payable in the following manner: (a) It is agreed that there exists as of the 20th day of April, 1971, a first mortgage in the amount of $ 1,379,632.50, with a five year term, amortized over 30 years, at 9-3/4% interest, the first payment due on or about October 1, 1971, in favour of National Trust Company, Limited and that Purchaser shall acquire the property described herein, subject to said mortgage.
(b) Purchaser shall pay $ 175,000.00 for all construction interest, financing points, and all other financing fees and/or standby fees upon closing and upon receipt of title to said apartments * * *. The closing statement for the purchase of the Norlang Estates apartments was as follows: VENDOR: NORLANG DEVELOPMENTS LTD. PURCHASER: NORLANG *663 ESTATES LTD. PROPERTY: LANGLEY APARTMENTS [Norlang Estates apartments] ADJUSTMENT DATE: NOVEMBER 1, 1971. DEBIT
CREDIT
TO PURCHASE PRICE
$ 1,730,000.00
BY DE DEPOSIT
$
TO Adjustment of Taxes
389.82
TO Adjustment of Insurance
(Sept. 17)
2,075.11
TO Tax debit held by National Trust
11,100.00
BY National Trust mortgage balance
1,379,632.50
BY Rental deposits
2,014.00
BY November rents
11,550.93
BY Construction interest payable
to National Trust
175,000.00
BY Balance due to North Road Holdings
Ltd. Mortgage
175,367.50
$ 1,743,564.93
$ 1,743,564.93
E. & O. E. NOTES: 1. All utilities such as electricity, gas, fuel oil, etc., to be adjusted in cash on the possession day directly between the Vendor and the Purchaser. 2. Fulton, Cumming, Bird, Richards are authorized to pay the above sums where applicable. The $ 50,000 discount was to be received by Norlang if the second mortgage on the property was paid off before a specified date. This second mortgage was paid in January 1972 which was before the specified date. On the Form 1065 filed by Norlang for the year 1971, which return was signed by petitioner in *664 his capacity as president of the general partner, Apartment, a deduction was taken for interest expense in the amount of $ 185,284 which included the $ 175,000 paid under the purchase contract for the Norlang Estates apartments. On this return in the depreciation schedule the acquisition date of the Norlang Estates apartments was shown as July 1, 1971. On this return, for depreciation purposes buildings were shown as having a basis of $ 1,271,000 and equipment, furniture and appliances were shown as having a basis of $ 279,000. The $ 50,000 discount provided for in the contract was not deducted in determining the basis of the Norlang Estates apartments. A note beneath the depreciation schedule stated as follows: Partnership property is Depreciated in accordance with Canadian Tax Law. Partnership assets are located entirely in Canada. The Partnership does not have any assets within the United States, nor does it conduct business within the United States. All Partnership business is conducted in Canada. On this Form 1065 return of income of Norlang a net loss of $ 320,711 was reported and this loss was allocated to the general partner and the various limited partners, including *665 petitioner, on the basis of their respective interests in the partnership. The loss allocated to petitioner was $ 3,817. Of the $ 175,000 paid by Norlang to the seller of the Norlang Estates apartments, $ 30,000 went to Russell B. Swartz in discharge of his real estate commission. One-half of this commission, or $ 15,000, was paid by Mr. Swartz to petitioner pursuant to an agreement dated August 9, 1971. In January 1973 the Revenue agent who was performing an aduit of the return of income of Norlang and petitioner's income tax return requested information from petitioner corroborating the interest deduction claimed on the Norlang 1971 return of income. On January 17, 1973, petitioner wrote the National Trust Company asking for the information requested by the Revenue agent and suggested that the response be purchased as follows: In response to your request for interest paid to us, we have determined from our records that we received the total amount of $     interest to November 1, 1971. On or about January 28, 1973, petitioner received a letter from the National Trust Company stating that "Interest paid from date of first advance, May 29th, 1971 to Ocotober 31st, 1971 *666 -- $ 41,038.82." When petitioner presented this letter to the Revenue agent, the date May 29, 1971, had been changed to May 29, 1970, and the interest figure appearing in the letter had been changed from $ 41,038.82 to $ 141,038.82. The Revenue agent wrote the National Trust Company on February 15, 1973, for information regarding the interest expense claimed by Norlang on its 1971 return of income. The agent received in reply a letter dated February 21, 1973, which showed the interest paid as originally shown in the letter to petitioner before alterations were made in the document. The alterations made in the letter to petitioner from the National Trust Company were made by petitioner before the document was presented to the Revenue agent. On the 1970 Form 1065 return of income of B & L, which return was signed by petitioner as an officer of Apartment, the Bellevue Estates apartments and the Lynnview apartments were shown on the depreciation schedule as having been acquired on October 1, 1970. The contract for purchase of the Bellevue Estates apartments by Apartment was signed by the parties to the contract on December 22, 1970, but recited that the agreement was made on October 1, 1970. *667 The Bellevue Estates apartments were transferred by Apartment to B & L. The cash was received from the buyer in the transaction involving the Bellevue Estates apartments on December 28, 1970, and the escrow agent opened the escrow on that date. The real estate contract for the purchase and sale of the Bellevue Estates apartments was drafted by the escrow agent from an earnest money agreement submitted to the escrow agent by the real estate agent in the transaction and from an interim or proposed contract supplied to the escrow agent by petitioner. Petitioner had written to the real estate agent on December 12, 1970, enclosing a preliminary offer to purchase the Bellevue Estates apartments. The earnest money receipt and the agreement relative to the purchase of the Bellevue Estates apartments which was submitted to petitioner by a letter dated December 18, 1970, recites that the purchase price of the apartments is $ 1,700,000 payable as follows: $ 50,000 in cash, including above earnest money of $ 10,000.00, as full down payment which be deposited in the form of certified or Cashier's check with Herbert J. Droker, Escrowee, the purchasers on or before 5:00 P.M. on December 31, 1970. *668 The sellers shall credit the $ 50,000.00 as pre-paid interest on the unpaid balance of the purchase contract hereinafter shown herein. Further payments by purchaser are to be made as follows: $ 25,000.00 on January 15, 1971: $ 25,000.00 on July 15, 1971; and $ 50,000.00 on January 15, 1973. The sale shall be closed as of December 31, 1970. The contract for the purchase of the Bellevue Estates apartments, signed December 22, 1970, provides in part: The date of closing of said sale and purchase is October 1, 1970. 2. The total purchase price is ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS ($ 1,550,000.00), payable as follows: a. ONE MILLION ONE HUNDRED THIRTY NINE THOUSAND, EIGHTY FIVE and 73/100 DOLLARS ($ 1,139,085.73), herein called "Schedule A balance", which sum is identical to the principal balance adjusted for interest of the Deed of Trust dated August 20, 1968, recorded September 6, 1969, under King County Auditor's File No. 6402888, executed by Seller to Firstbank Mortgage Corporation as beneficiary, assigned by Firstbank Mortgage Corporation to and held by United Benefit Life Insurance Company, known as "United of Omaha". The Schedule A balance shall be paid *669 as follows: * * * b. The Purchaser shall pay FIFTY THOUSAND DOLLARS ($ 50,000.00) interest on the 31st day of December, 1970; TWENTY-FIVE THOUSAND DOLLARS ($ 25,000.00) interest on the 15th day of January, 1971; TWENTY-FIVE THOUSAND DOLLARS ($ 25,000.00) on the 1st day of July, 1971; and FIFTY THOUSAND DOLLARS ($ 50,000.00) interest on the 15th day of January, 1973. It is fully agreed between the parties hereto that Seller's equity shall bear interest in the following amounts for the period specified, in addition to the interest payments provided in section (3) below: Period
Interest
October 1, 1970 through December 31, 1971
$ 60,000
January 1, 1971 through December 31, 1972
45,000
January 1, 1973 through December 31, 1973
45,000
3. The balance of the purchase price in the amount of $ 410,914.27, being Seller's equity, shall be increased by $ 4,761.63 (the resultant of prorated deposits, real estate taxes, insurance premiums and reserve accounts) to $ 415,675.90, herein called "Schedule B Balance". The Schedule B Balance shall bear interest determined as follows: * * * The prorating of th insurance policy and other charges relative to the Bellevue Estates *670 apartments sale were done ad of January 1, 1971. Although the instructions to the escrow agent by the parties were that the transaction was to close as of the last day of 1970, the prorating was done as of January 1, 1971, to avoid the necessity of calculating the expenses of 1970 to be charged to the seller for one day of that year. The rent for the entire year 1970 from the Bellevue Estates apartments was received and kept by the seller and the seller did not bill petitioner or Apartment for any expenses for 1970, nor was any 1970 income allocated to Apartment. Petitioner negotiated on behalf of Apartment the purchase of the Lynnview apartments which Apartment transferred after purchase toB & L. The contract for the purchase of the Lynnview apartments states that it was made on the first day of October 1970. The transaction was closed in late December 1970 although the contract provided that the "closing date shall be October 1, 1970" and further provided for adjustments of taxes, insurance and various other items as of the closing date. The prior owner, Harry Pryde, operated the apartments until the end of December 1970. He collected the rent on those apartments through *671 December 1970, deducted the expenses for that period of time and did not turn any portion of the receipts or receive any reimbursement of the expenses from petitioner or Apartment of B & L. When the transaction with respect to the Lynnview apartments was closed in late December and B & L took over the operation of the apartments on January 1, mortgage payments with respect to the apartments were made directly to the prior owner, Harry Pryde. The contract for the sale of the Lynnview apartments to Apartment provided that the property was subject to the following liabilities, with the balances as of the date of sale as listed: Union Federal Savings
& Loan Association
$ 586,693.05
Reuben Gunst
10,224.24
Harry Pryde (Seller's
Equity)
93,296.67
The contract recites that the total purchase price of the Lynnview apartments is $ 686,000. It further recites that-- Fourteen Thousand Dollars ($ 14,000) (b) The Purchaser shall pay Fifteen Thousand Dollars ($ 15,000) interest on or before the 31st day of December, 1970. It is fully agreed between the parties hereto that Seller's equity shall bear interest for the period specified below, and that thereafter interest *672 shall be as provided in section (3). PERIOD
INTEREST
10-1-1970 through 9-30-71
$ 14,000
3. The balance of the purchase price in the amount of ($93,296.67), designated as Seller's equity shall be increased or decreased by those prorated amounts contained in and set forth on the closing statement, which is incorporated by reference herein. The closing date shall be October 1, 1970. On the original partnership return of income of 88th East, which was signed by petitioner Paul M. Hansen as the chief executive officer of Apartment, the depreciation schedule showed that the 88th East apartments and the Casino Terrace apartments were acquired on July 1, 1971. On a first amended partnership return of income for 88th East these apartments were shown as having been acquired on November 1, 1971, and this same acquisition date was shown on a second amended return. Petitioner represented Apartment in the acquisition of the 88th East apartments and the Casino Terrace apartments from G & M. Investments. These apartments were turned over by Apartment to 88th East after their acquisition. The real state contract was dated November 5, 1971, although negotiations with respect *673 to the purchase of the apartments took place in the fatter part of November and December 1971 and the final closing and release of the escrow funds with respect to the purchase and distribution of funds to the sellers occurred on January 6, 1972. In May 1972 the Revenue agent examining the 88th East partnership return of income looked at the prospectus for this partnership. He placed paper clips on certain pages of the prospectus and asked for copies of those pages. One of the pages on which a paper clip was placed was a letter dated November 29, 1971, addressed to "Mr. Paul Hansen, B & L Enterprises, Ltd., 817 Oak Drive, South Ogden, Utah" and signed by M. R. Mastro for G. & M. Investments. This letter stated: The following is submitted as per our telephone conversation of November 25, 1971. 88th East Apartments (* * *) Completed November 1, 1971 Casino Terrace Apartments (* * *) To be completed January 1, 1971 Recap
88 Units
144 Units
232 Units at 10,500
$ 2,436,000.00
The last sentence of the letter stated: Terms can be arranged with considerable flexibility and I do feel that this represents an attractive long term investment. After requesting *674 photostatic copies of items in the prospectus, including a copy of the letter dated November 29, 1971, the Revenue agent receive in the mail a document which was a copy of the November 29, 1971, letter with the date removed and the price per unit as shown in the letter of $ 10,500 with a total of $ 2,436,000 also removed. Also removed were the statements "Completed November 1, 1971" under the 88th East apartments and "To be completed January 1, 1971" under the Casino Terrace apartments. Later at a meeting between the Revenue agent and a representative of the seller of the 88th East apartments and the Casino Terrace apartments, the agent received a copy of the requested letter from the representative with the dates and amounts shown thereon. The various buildings in the Chateau apartments complex were designated by letters. In addition to the apartment buildings there was a clubhouse building in the complex. Records of the Utah Power and Light Company show the following information with respect to electrical hookups to tenants' apartments during 1971: Connection
Apartment
Power to Unit
Tenant
Date
Number
Date Set
Don Hansen
9-27-71
3-D
9-27-71
Jay P. Clark
10-04-71
1-D
9-27-71
Larry Castano
9-27-71
2-D
9-27-71
Chateau Corporation
9-27-71
H & B - D
9-27-71
Frank A. Jones
11-01-71
4-D
9-27-71
Kent H. Saxey
10-05-71
2-D
9-27-71
Leo J. Millner
10-11-71
6-D
9-27-71
Elden Zuchetto
11-02-71
5-D
9-27-71
James Veruille
9-27-71
10-D
9-27-71
[Illegible] Brown
11-01-71
9-D
9-27-71
[Illegible] Dalby
9-27-71
8-D
9-27-71
Andrew S. Jensen
11-01-71
10-E
10-11-71
[Illegible] Porter
11-04-71
9-E
10-11-71
Linda Callihan
10-11-71
8-E
10-11-71
Joe L. Swapp
12-24-71
7-E
10-11-71
Wayne Newton
10-11-71
6-E
10-11-71
Richard Brady
5-05-72
5-E
10-11-71
Hal Lines
11-9-71
4-E
10-11-71
Chateau Corporation
10-04-71
H & B - E
10-04-71
Kent Pantone
11-17-71
3-E
10-11-71
Jerry W. Wheeler
11-02-71
2-E
10-11-71
George B. LeSueur
See old sheet
1-E
10-11-71
Bruce Foster
2-15-72
3-F
10-11-71
John M. Beasley
9-01-72
7-F
10-11-71
Delores Hannen
5-07-72
1-F
10-11-71
Chateau Corporation
9-28-71
H & B - F
9-28-71
Richard B. Roberts
8-14-72
4-F
10-11-71
John K. Busenback
4-01-72
5-F
10-11-71
Kenneth R. Kotter
5-19-72
6-F
10-11-71
Russell D. Street
2-02-72
7-F
10-11-71
[Illegible] Sparks
12-26-71
10-F
10-11-71
[Illegible] Unck
12-27-71
9-F
10-11-71
Arthur Thumball
1-19-72
8-F
10-11-71
James W. MaGaughey
1-10-72
10-T
10-11-71
Steven D. Page
1-28-72
9-T
10-11-71
[Illegible] Blosen
4-15-72
8-T
10-11-71
Chateau Corporation
9-28-71
H & B - T
9-28-71
Charles Fields
3-12-72
7-T
10-11-71
Fred M. Owen
2-22-72
6-T
10-11-71
John Barton
5-01-72
5-T
10-11-71
Larry G. Brady
2-28-72
4-T
10-11-71
Gary S. Miller
8-07-72
3-T
10-11-71
Kent H. Saxey
1-24-72
2-T
10-11-71
James Veruille
2-07-72
1-T
10-11-71
*675 Prior to the date of setting of power to the units, Chateau had a temporary hookup for electric power to the buildings. The records of Chateau show a payment to Utah Power and Light of July 21, 1971, in the amount of $ 453. The record also shows that power to building A was set on January 12, 1972. When apartments were rented in the various buildings of the Chateau apartments, the power units in the apartments were never transferred to the tenants' names until after the tenants moved into the apartments, and at times when a tenant moved into an apartment prior to the time the power was transferred to the tenant's name, the tenant would use power from the hookup in the name of Chateau. There were persons living in the Chateau apartments on September 9, 1971. Building A was completed in 1971 and apartments rented in it. Chateau tried to get tenants moved in before Christmas and some actually moved in right after Christmas. There was a furnished model apartment in building T. This building was finsihed in September 1971 and the model apartment was open for inspection at that time. Each of the apartments in the various buildings of the Cheteau apartments contained appliances, *676 draperies and carpeting which were installed prior to a tenant moving into an apartment. The clubhouse was completed and furniture and fixtures installed therein sometime prior to the end of the 1971. Chateau did not maintain a double entry set of books for the year 1971. The records kept in the single entry set of books were transferred to a computer and the records kept on a computer. Anna Rae Nelson was the bookkeeper for Chateau from the time it commenced operations until February of 1972. She kept the books under the general direction of petitioner. She verified bills and the drew the checks in payment thereof and entered the amounts in the books. Beginning in April 1971 petitioner received checks from Chateau. The following shows the check number, date and amount of the checks received: Check Number
Date
Amount
123
4/01/71
750
134
4/13/71
1,000
135
4/13/71
750
139
4/15/71
500
165
5/07/71
750
178
6/01/71
750
245
7/12/71
750
278
8/03/71
750
371
9/03/71
750
403
10/04/71
750
484
11/01/71
750
599
12/20/71
750
The total amount of these checks--$ 9,000--was treated on the books of Chateau as a partner's draw. The *677 following shows how the partners' accounts were handled on Chauteau's books through the end of 1976: Chateau Partnership Analysis of Capital Account Paul
Byron
Paul
Evan
Hansen
Naisbitt
Naisbitt
Evans
1971--Capital Contributed
0
0
0
0
Loss - Ordinary
(43781)
(43781)
(43781)
(43780)
Draw -
9000
0
0
0
Blance 1971
(52781)
(43781)
(43781)
(43780)
1972--Capital Contributed
Schedule I
28454
13255
13255
13255
Loss - Ordinary
( 337)
( 337)
( 337)
( 337)
Draw -
( 8000)
0
0
0
Loss - Sect. 1231
(29663)
(45380)
(45380)
(45381)
Balance 1972
(62327)
(76243)
(76243)
(76243)
1973--Capital Contributed
Schedule II
3317
3317
3317
3317
Loss - Ordinary
( 60)
( 60)
( 60)
( 60)
Draw -
( 5250)
0
0
0
Loss - Sect. 1231
( 6662)
( 6661)
( 6662)
( 6661)
Balance 1973
(70982)
(79647)
(79648)
(79648)
1974--Capital Contributed
Schedule II
39494
38735
38734
38735
Loss - Ordinary
(57357)
(57358)
(57357)
(57358)
Draw -
( 3500)
0
0
0
Balance 1974
(92345)
(98270)
(98271)
(98271)
1975--Capital Contributed
Schedule IV
11368
26363
26363
26369
Loss - Ordinary
(78496)
(78496)
(78496)
(78497)
Balance 1975
159473
150403
150404
150399
1976--Capital Contributed
Schedule V
3500
8000
8000
8000
Loss - Ordinary
(47711)
(47711)
(47711)
(47711)
Gain - Long term
4395
4395
4395
4395
Draw
(80767)
(80774)
(80773)
(80773)
Balance 1976
280056
266493
266493
266487
CASH PAID IN
91723
85537
85537
85537
Ending Balance
274460
270626
270626
270626
*678 J. Blair Jones, a partner in Chateau until about November 1, 1971, who supervised the construction of the buildings, received checks in the amount of $ 1,500 a month from Chateau which were also treated on the books of Chateau as partner's draw. The total amount received in 1971 by Mr. Jones from Chateau Partnership was $ 13,000. Chateau took no deduction for the draws it showed on its books of either petitioner or Mr. Jones. When Mr. Jones withdrew from the partnership about the first of November 1971 because of disagreements with petitioner, his partnership interests and accounts were settled. Chateau claimed an interest deduction on its tax return of $ 114,887.39 for the year 1971. The records of Chateau show payments of this amount of interest. A letter from the Utah Mortgage Loan Corporation to an agent of respondent stated that during 1971 Chateau paid the Utah Mortgage Loan Corporation $ 106,696.70 and during 1972 paid it $ 117,206.05. Chateau of its 1972 partnership return of income claimed a deduction of $ 113,347.61 for interest paid. On its 1971 tax return Chateau claimed a deduction for legal and professional fees in the amount of $ 8,220.85. The Chateau apartments *679 were constructed from pre-cut components. Some of the constructon was average and some below average. The buildings constructed in 1971 were mostly below average construction. During the calendar year 1971 petitioner maintained jointly with his wife, Marie B. Hansen, the following bank accounts: Bank
Account No.
Type
Bank of Utah
301804-0
Savings
Ogden, Utah
Bank of Utah
3-21-229-7
Checking
Ogden, Utah
Davis County Bank
8260
Savings
Farmington, Utah
Davis County Bank
7998
Savings
Farmington, Utah
Davis County Bank
101-10522-12
Checking
Farmington, Utah
Petitioner did not personally conduct any of the transactions at the Davis County Bank, Farmington, Utah, with respect either to the checking or savings accounts. All transactions in these three accounts were conducted by petitioner's wife, although checks made payable to petitioner were deposited in these accounts. A check for $ 2,500 to petitioner from Apartment was deposited in petitioner's checking account in the Davis County Bank on December 6, 1971. Petitioner received a check dated October 8, 1971, from Apartment for $ 1,000. On the face of the check there appeared in handwriting *680 "Payment for 60 day land option for Chateau Partnership." On October 9 this check was endorsed by petitioner to Dean Real Estate in Ogden, Utah. On the back of the check in handwriting appeared the following note: Land Deposit for Evan Evans, Paul Naisbitt, Byron Naisbitt and Paul Hansen. Land owned by Doug Stephens. Oakridge area. Evan Evans, Paul Naisbitt, and Byron Naisbitt were doctors who owned an interest in Apartment and who were the other three partners in Chateau. The $ 1,000 was shown by Dean Real Estate on its books as earnest money. The ledger sheet reflecting the $ 1,000 check shows that the $ 1,000 was repaid by Dean Real Estate on April 12, 1972. Petitioner received interest income in 1971 in the amount of $ 72.92 which was not reported on his Federal income tax return for that year. Petitioner, on his Federal income tax return for 1971 showed adjusted gross income as a loss of $ 16,083.40 computed as follows: Wages, salaries, tips, etc.
$ 17,328.58
Interest
167.38
Income other than wages, dividends, and interest
(33,579.36)
Adjusted gross income
(16,083.40)
The income other than wages, dividends, and interest was computed as follows: *681 Professional Income
$ 39,183.41
Expenses
11,731.13
Net Fees and Other Professional Income
$ 27,452.28
Net Long Term Capital Loss
( 235.77)
Partnership Loss from B & L Enterprises
(13,434.00)
Partnership Loss from Chateau Partnership
(43,780.64)
Norlang Estates Limited, Partnership Loss
( 3,817.00)
Net Business Income or Loss
(33,579.36)
The loss of $ 16,083.40 shown by petitioner on his 1971 return was carried back to 1968 to offset taxable income shown on that return of $ 10,332.94. On the basis of the loss carryback claim respondent refunded to petitioner the entire $ 2,035.24 tax paid by petitioner for the year 1968 plus interest. Attached to petitioner's 1971 return were letters from B & L, Chateau and Norlang setting forth the partnership losses and petitioner's prorata share thereof. The Chateau letter stated in part: Taxpayer's share of the operating loss of Chateau Partnership for 1971 is $ 39,780.64 plus $ 4,000.00 1st year depreciation for a total operating loss of $ 43,780.64. * * * Included in the business expenses shown on petitioner's return as connected with his professional income including his work as a Justice of the Peace *682 was $ 2,099.16 stated to be "Auto expenses, travel research, 18,324 miles 12" for 15,000 miles - 9" for 3,324 miles." Petitioner's tax return shows that he was entitled to six exemptions and that he had the following personal deductions: Contributions, $ 4,245, with a notation "No charitable contributions claimed--contributions carried over to 1972;" Taxes, $ 1,466.66; Interest expense, $ 2,296.25. The Chateau partnership return for the year 1971 shows rental income for September, October, November and December totaling $ 5,967.55 and expenses of $ 165,090.13 resulting in a loss of $ 159,122.58, and additional first year depreciation of $ 16,000 resulting in a total loss of $ 175,122.58. The depreciation schedule on that return shows the following: Date acquired
July 1, 1971 Buildings
Cost
$ 574,900
Method & Life
DDB 25 years
1971 Reg. Dep.
$ 22,996
1971 Additional
1st Yr. Depreciation
$ 160,000 [sic]
The schedule of the partners' share of loss in the Chateau partnership for the year 1971 shows each partner's share of the loss as $ 39,780.64 and that each partner's share of first year depreciation is $ 4,000, making a total loss for each of $ 43,780.64. *683 Included in the expenses deducted on the return was interest of $ 114,887.39 and legal and professional services of $ 8,220.85. Respondent in his notice of deficiency to petitioner showed the taxable income as shown on petitioner's return as a loss of $ 23,896.31, total adjustments of $ 50,732.80, with a taxable income as revised of $ 26,836.49. The adjustments to petitioner's income were shown as follows: Partnership Income or (Loss) - ordinary -
Norlang Estates Ltd.
3,715.56
Partnership Income or (Loss) - ordinary -
B & L Enterprises
7,904.00
Partnership Income or (Loss) - ordinary -
Chateau Partnership
8,358.56
Additional First Year Deprec. - Chateau
Partnership
4,000.00
Section 1231 Loss - Chateau Partnership
Capital Gains & Losses
(235.77)
Charitable Contributions
(4,245.00)
Other Income - Unexplained Deposits
16,354.27
Unreported Interest Income
72.92
Unreported Fees
12,709.10
Auto Expense
2,099.16
In explanation of the first adjustment respondent showed a recomputation of the 1971 loss of Norlang reducing its reported loss of $ 320,711 to a loss of $ 8,524.47, with petitioners' distributive share of the revised loss being $ 101.44 *684 rather than the claimed loss of $ 3,817. In the computation respondent disallowed management and consulting fees as a deduction and capitalized them, and reduced the purchase price of the Norlang apartments by $ 50,000 for a discount allowed. Respondent recomputed depreciation as claimed on the Norlang partnership return on the basis of his revised cost of the property arriving at allowable depreciation of $ 14,957.76 rather than the claimed $ 119,350. Other major adjustments resulting in this decrease in depreciation were an allocation of $ 1,584,900 of the price paid for the apartments to the buildings rather than the $ 1,271,000 allocated on Norlang's return and the allocation of $ 52,500 to furniture and fixtures rather than the $ 279,000 allocated on the return, a use of a 10-year useful life rather than the 6 years shown on the Norlang return for furniture and fixtures, a 40-year useful life rather than the useful life shown on the return for the buildings and a beginning date for depreciation of November 1, 1971, rather than July 1, 1971. Respondent disallowed claimed interest expense in the amount of $ 174,394.19, which represented basically the $ 175,000 paid by Norlang *685 to the seller and denominated in the contract of sale as construction interest. Respondent disallowed the claimed deductions for $ 26,400 management fees and $ 7,000 for consulting fees which amounts as heretofore stated were capitalized and added to the basis of the property acquired. Respondent in his notice of deficiency determined that petitioner's loss from B & L in 1971 was $ 5,530 rather than the claimed $ 13,434. The loss reported by B & L on its 1971 return was $ 233,752. Respondent adjusted this claimed loss by disallowing $ 50,000 claimed to be deductible as mortgage interest expense and $ 100,166.76 of the claimed depreciation expense deduction. The $ 50,000 mortgage interest expense represented the two $ 25,000 payments of amounts denominated as interest referred to in the contract with respect to the purchase of the Bellevue Estates apartments. In making this adjustment respondent determined that the basis of the building of the Bellevue Estates was $ 1,402,285.50 rather than the $ 1,105,500 shown by B & L on its partnership return of income and that the basis of furniture and fixtures was $ 83,475 rather than $ 304,500. With respect to the Lynnview apartments, *686 respondent determined that the basis of the building was $606,683.69 rather than $ 506,182 shown on the B & L partnership return and the basis of the furniture and fixtures was $ 47,651.94 rather than the $ 93,818. Respondent further determined that the useful life of each of these buildings was 37 years rather than the 25 years shown on the B & L return and that the useful life of the furniture and fixtures in each building was 5 years rather than the 6 years shown on the return. Respondent also determined that the furniture and fixtures should be depreciated on the declining balance rather than on the double declining balance basis and that the date the apartments were acquired was January 1, 1971, rather than October 1, 1970, as shown on the return so that there was no depreciation allowed or allowable for prior years. Respondent in his notice of deficiency determined that petitioner's share of the ordinary loss of the Chateau partnership was $ 31,422.08 rather than the $ 39,780.64 claimed and that petitioner as a member of the Chateau partnership was entitled to no first year depreciation. The adjustments made by respondent in arriving at the reduction in petitioner's partnership *687 loss from Chateau was a reduction in the depreciation deduction claimed by the partnership of $ 17,022.72, a reduction in interest expense deduction of $ 8,190.69 and a disallowance of the deduction claimed for legal and professional services of $ 8,220.85, making a total reduction in the loss reported by Chateau on its 1971 return of partnership income of $ 33,434.26. Respondent in computing depreciation for Chateau at $ 5,973.28 rather than the $ 22,996 shown as depreciation other than first year depreciation on the return, computed depreciation from September 1971 on Building D and from October 1971 on Building E and the clubhouse. Respondent's computation of depreciation for 1971 and 1972 is as follows: KIND OF
PROPERTY
COST OR
(If buildings,
state type of
OTHER BASIS
construction.
Exclude land
DATE
(Less
and salvage value
from basis)
ACQUIRED
exclusions)
Building D
9/71
$ 135,535
Furniture &
Fixtures
Bldg. D
9/71
5,442
Building E
10/71
135,535
Furniture &
Fixtures
Bldg. E
10/71
5,442
Building T
1/72
135,535
Furniture &
Fixtures Bldg.
T
1/72
5,442
Building F
2/72
135,535
Furniture &
Fixtures Bldg.
F
2/72
5,442
Building A
4/72
142,587
Furniture &
Fixtures Bldg.
A
4/72
5,725
Building G
5/72
135,536
Furniture &
Fixtures Bldg.
G
5/72
5,441
Building H
7/72
135,536
Furniture &
Fixtures Bldg.
H
7/72
5,441
Building B
7/72
142,588
Furniture &
Fixtures Bldg.
B
7/72
5,725
Building C
8/72
142,588
Furniture &
Fixtures Bldg.
C
8/72
5,725
Clubhouse
Building
10/71
81,719
Clubhouse
Furniture &
Fixtures
10/71
3,281
Total Depreciation Expense Allowable on Items Changed
Depreciation Expense Claimed on Items Changed
Adjustment - Increase/(Decrease)
*688 REMAINING
COST OR OTHER
KIND OF
PROPERTY
DEPRECIATION
BASIS TO BE
(If buildings,
state type of
ALLOWED OR
RECOVERED
construction.
Exclude land
ALLOWABLE IN
and salvage
value from
basis)
PRIOR YEARS
(Date)
METHOD
Building D
$ 0
$ 135,535
DB
Furniture &
Fixtures Bldg.
D
0
5,442
DB
Building E
0
135,535
DB
Furniture &
Fixtures Bldg.
E
0
5,442
DB
Building T
0
135,535
DB
Furniture &
Fixtures Bldg.
T
0
5,442
DB
Building F
0
135,535
DB
Furniture &
Fixtures Bldg.
F
0
5,442
DB
Building A
0
142,587
DB
Furniture &
Fixtures Bldg.
A
0
5,725
DB
Building G
0
135,536
DB
Furniture &
Fixtures Bldg.
G
0
5,441
DB
Building H
0
135,536
DB
Furniture &
Fixtures Bldg.
H
0
5,441
DB
Building B
0
142,588
DB
Furniture &
Fixtures Bldg.
B
0
5,725
DB
Building C
0
142,588
DB
Furniture &
Fixtures Bldg.
C
0
5,725
DB
Clubhouse
Building
0
81,719
DB
Clubhouse
Furniture &
Fixtures
0
3,281
DB
Total Depreciation Expense Allowable on Items Changed
Depreciation Expense Claimed on Items Changed
Adjustment - Increase/(Decrease)
KIND OF
PROPERTY
RATE
DEPRECIATION ALLOWABLE
(If buildings,
state type of
(%) OR
YEAR ENDED (or Period)
construction.
Exclude land
LIFE
and salvage
value from
basis)
(YEARS)
12/31/1971
12/31/1972
Building D
40
$ 2,258.92
$ 6,108.49
Furniture &
Fixtures Bldg.
D
8
453.50
1,143.20
Building E
40
1,694.19
6,134.37
Furniture &
Fixtures Bldg.
E
8
340.12
1,169.18
Building T
40
6,212.02
Furniture &
Fixtures Bldg.
T
8
1,247.13
Building F
40
5,647.29
Furniture &
Fixtures Bldg.
F
8
1,133.75
Building A
40
4,752.90
Furniture &
Fixtures Bldg.
A
8
954.17
Building G
40
3,953.13
Furniture &
Fixtures Bldg.
G
8
793.48
Building H
40
2,823.67
Furniture &
Fixtures Bldg.
H
8
566.77
Building B
40
2,970.58
Furniture &
Fixtures Bldg.
B
8
596.35
Building C
40
2,376.47
Furniture &
Fixtures Bldg.
C
8
477.08
Clubhouse
Building
40
1,021.49
3,698.63
Clubhouse
Furniture &
Fixtures
8
205.06
704.90
Total Depreciation Expense Allowable on Items
Changed
$ 5,973.28
$ 53,463.56
Depreciation Expense Claimed on Items Changed
22,996.00
0
Adjustment - Increase/(Decrease)
17,022.72
(53,463.56)
*689 In explanation of "Other income - unexplained deposits" of $ 16,354.27 for the year 1971 set forth in the notice of deficiency respondent stated as follows: Unidentified deposits in Davis County Bank Acct.
#8260
$ 589.00
Unidentified deposits in Davis County Bank
Acct. 101-10522-12
15,255.27
Unidentified deposits in Davis County
Bank Acct. #7998
510.00
Total other income
[2] $ 16,354.27
In explanation of his increase in petitioner's income because of the unreported fees for services, respondent *690 in his notice of deficiency stated: It is determined that you received fees, for services rendered, of $ 9,209.10 from Chateau Partnership and $ 3,500.00 from Utah Apartment Enterprises in 1971 that were not reported on your income tax return. Therefore, your taxable income is increased in the amount of $ 12,709.10 in 1971. [3]
OPINION The record in this case is clear that absent the showing of fraud for the year 1971 the statute of limitations bars any assessment of a deficiency. Section 6501(c)(1) provides that-- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. Therefore, unless respondent can show that petitioner filed a false and fraudulent return with intent to evade tax, no deficiency may be assessed or collected for the year 1971. Section *691 6653(b) provides that-- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * Therefore, in order for respondent to be entitled to an addition to tax, he must show that petitioner's return for the year 1971 was false or fraudulent and that there was an underpayment of tax for the year 1971 a part of which was due to fraud. Since respondent relies in great part in his argument on the presumption of correctness of his determination in the notice of deficiency and petitioner's failure to show error in that determination, in our view the starting point in considering this case is whether respondent has shown any underpayment of tax by petitioner in 1971. Initially the burden is on respondent to show that there is some deficiency in petitioner's tax for 1971 in order to show that the statute of limitations does not bar that year and, likewise, respondent must establish an underpayment of tax before he has shown that a part of the underpayment is due to fraud. While, as respondent points out, it is not necessary that he show that *692 the deficiency or underpayment arises solely from items fraudulently omitted from the return, Lowy v. Commissioner,288 F.2d 517 (2d Cir. 1961), affirming a Memorandum Opinion of this Court, it is necessary for respondent to show enough omitted items or improper deductions by petitioner to result in a deficiency or underpayment of tax. For this reason we have first approached this case by determining to what extent respondent has shown either omissions of income or improper deductions taken by petitioner. If, after this analysis, the result is that there is some deficiency or underpayment of tax, then we must determine if any part of this underpayment or deficiency is due to fraud. Only if respondent has shown that there is some underpayment of tax by petitioner in 1971 a part of which is due to fraud, may he rely on the presumption of correctness of his notice of deficiency to include in petitioner's income items set forth therein with respect to which evidence is lacking. The adjustments made by respondent in his notice of deficiency total $ 55,212. Respondent determined that petitioner was entitled to an additional capital loss of $ 235.77. He also allowed *693 petitioner a deduction for charitable contributions of $ 4,245 thus arriving at his adjustment of $ 50,732.80 to petitioner's reported loss of $ 23,896.31. Since charitable contribution deductions are limited to a percentage of adjusted gross income, we will first consider whether respondent has shown either improper deductions by petitioner or additions to petitioner's income in an amount necessary to cause petitioner to have some income before deductions for charitable contributions. Unless respondent has shown either income not reported by petitioner or improper deductions by petitioner to this extent, he has failed to show that any fraud committed by petitioner resulted in any underpayment of tax. [4]
*694 Respondent conceded that he improperly included $ 14,409 of amounts of unexplained deposits in petitioner's income for 1971.Respondent also conceded that he improperly included $ 209.10 of unreported fees in petitioner's 1971 income. After these two concessions, it is necessary that respondent show either omissions from income by petitioner or improper deductions by petitioner totaling $ 16,462.90 in order for any underpayment to exist. In making this showing, respondent cannot rely, as he does throughout his brief, on any presumption of correctness of his notice of deficiency. See Jenkins v. United States,313 F.2d 624, 627 (5th Cir. 1963); Elfmon v. United States,209 F.2d 642-643 (4th Cir. 1954). [5] In George v. Commissioner,338 F.2d 221 (1st Cir. 1964), remanding a Memorandum Opinion of this Court, it was specifically pointed out that in establishing that there is a deficiency or underpayment in tax where the statute bars the deficiency absent fraud, respondent cannot rely on the presumption of correctness of his determination to support any item necessary to show some deficiency but must establish these items by evidence. *695 The court stated this principle as follows (at 223): *696 Since the burden was on the Commissioner to prove fraud, it must follow that he had the burden of proving every subsidiary fact relied upon by the court to support that ultimate conclusion. To permit, in satisfying this burden, the use of a Commissioner's finding that was to be accepted only because the taxpayer had failed to meet a burden of overcoming it, would be to allow the Commissioner to raise himself by his own bootstraps. Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316; Olinger v. Commissioner, 5 Cir., 1956, 234 F.2d 823; cf. Valetti v. Commissioner, 3 Cir., 1958, 260 F.2d 185, 188. See also Spitaleri v. Commissioner,32 T.C. 988, 993 (1959), in which we pointed out that in a year that was closed, absent respondent's proof of fraud "we must make our assumptions in petitioner's favor where clear and convincing proof is lacking." Viewing the evidence in this record in the light of the burden on respondent to prove some underpayment of tax, we conclude that respondent has failed to establish that a deficiency exists in 1971. Respondent has totally failed to show that petitioner was not entitled to the deduction *697 of $ 2,099.16 taken on his return for automobile expenses. Respondent in his argument in this regard relies primarily on petitioner's failure to carry his burden of proof. The record here clearly establishes that petitioner was entitled to some deduction for automobile expenses. The diary kept by petitioner with respect to these expenses was identified by petitioner's wife. She also specifically testified with respect to certain trips he took on which she accompanied him. Respondent argues that these trips may have been in connection with activities which would require that the expense be capitalized rather than deducted. However, respondent has totally failed to show that the activities of petitioner on many of these trips were not in connection with his activities as a partner in a partnership or in his personal professional business or in his capacity as an officer of Apartment. Other witnesses testified with respect to petitioner's trips to the site of the Chateau apartments and the office where the financial and bookkeeping activities of Chateau were conducted.It is true that during a part of this time the apartments were under construction, but during a part of the time *698 the apartments were available for rental and being rented. When petitioner travels in connection with his business as an officer of Apartment, the cost of such automobile expense is deductible. Respondent has likewise failed to show that $ 2,500 of the $ 3,500 paid to petitioner by Apartment in 1971, which respondent included in unreported fees, was not included in the $ 39,000 of professional income reported by petitioner on his tax return. The record shows that Apartment in its fiscal year ended June 30, 1972, claimed a substantial deduction for compensation in the form of fees and commissions paid to petitioner, as well as to its other officers.The record of course does not show the amount paid to petitioner by Apartment in 1971 as distinguished from 1972, nor does it show the composition of the $ 39,000 of fees reported by petitioner. In this state of the record we conclude that respondent has failed to show that the $ 2,500 which he included in unreported fees by petitioner received from Apartment was not in fact reported on petitioner's return. See Spitaleri v. Commissioner,supra.The remaining $ 1,000 of the amount included by respondent in his notice *699 of deficiency as unreported fees from Apartment was an amount used by petitioner as an earnest money payment on land to be acquired by the partners in Chateau. Respondent argues that this $ 1,000 was a payment by Apartment to petitioner and that petitioner then lent $ 750 of the amount to the three other partners in Chateau. However, the conclusion that the $ 1,000 was an advance or loan to Chateau by Apartment is equally reasonable and, with the burden of proof on respondent, he has failed to sustain his position that this $ 1,000 was income to petitioner. The other items that respondent has totally failed to show should properly be added to petitioner's income are the $ 8,358.56 reduction in ordinary loss reported by petitioner from Chateau and the $ 4,000 additional first year depreciation claimed by petitioner to be deductible in that year as his prorata share of Chateau's first year depreciation. The adjustments reducing the loss claimed by Chateau by $ 33,434.26, of which petitioner's 25 percent interest is $ 8,358.56, consist of three items. One of these items is a disallowance of a deduction to Chateau for legal and professional services in the amount of $ 8,220.85. Respondent *700 in his brief frankly admits there is no evidence in the record concerning this item and argues that petitioner has failed to show error in his determination. However, this payment shows on the records of Chateau which are in evidence. The lack of evidence to the contrary results in respondent's failing to carry his burden of showing that this amount was not properly deductible by Chateau on its return. The second of these items is $ 8,190.69 of disallowed interest expense. To support this disallowance respondent relied exclusively on a letter from Utah Mortgage Loan Corporation stating that during 1971 Chateau paid Utah Mortgage Loan Corporation $ 106,696.70 in interest. The record, however, does not show that petitioner did not make other interest payments and the records of the partnership show total interest paid in 1971 of $ 114,887.39. For the year 1972 Utah Mortgage Loan Corporation in a letter to an agent of respondent stated that Chateau paid interest to it of $ 117,206.05. Chateau of its 1972 return of income deducted as interest paid to Utah Mortgage Loan Corporation only the amount of $ 113,347.61. In this state of the record we conclude that respondent has failed *701 to show that the deduction taken by Chateau for interest was not proper. The final item of adjustment to the Chateau return was a decrease in depreciation of $ 17,022.72. This decrease was the result of respondent changing the date when the buildings were first "placed in service," and therefore subject to depreciation, and increasing the useful life of the buildings from 25 years to 40 years. The record shows that construction on the buildings started on March 1, 1971, and that five of the buildings had at least some units rented before the end of the year 1971. Respondent relied entirely for his computation on dates of electrical hookups in the names of the tenants in specific apartments. On this basis he allowed depreciation only on two buildings and the clubhouse for any part of 1971. However, the record shows that the power units were in and electricity set to at least two of the buildings in September of 1971 and to two other buildings in October 1971. Testimony by Mr. Jones was to the effect that tenants were in some of the buildings as early as September 9, 1971. Another witness testified that often the electrical service was not changed from the name of the partnership *702 to the name of the tenant on the date the tenant moved into the apartment. She also testified that tenants moved into some apartments when the temporary electrical hookup was still in use and that a fifth building, Building A, was completed and tenants were in the building before the end of 1971. Considering this record as a whole, it is totally inadequate to establish that the amount of depreciation claimed on these buildings by Chateau in 1971 was incorrect. Furthermore, the evidence with respect to the useful life of the buildings is contradictory. There is evidence in the record supporting the position that the construction of the building was below average and the buildings were of a type that would not normally be expected to have a useful life of 40 years. The only evidence respondent offered to support a 40-year useful life for the buildings was the testimony of an engineer Revenue agent who had looked at the exterior of the buildings in 1979 after they had been converted to condominiums. This witness did not even know which of the buildings in the complex were the ones built in 1971. On the basis of this record, respondent has totally failed to show that Chateau was *703 not entitled to the amount of depreciation on the buildings claimed on its return. Respondent's argument with respect to the first year depreciation is not that Chateau did not have personal property subject to first year depreciation but rather that Chateau did not comply with section 1.179-4(a), Income Tax Regs., in that it did not-- maintain records which permit specific identification of each piece of section 179 property and reflect how and from whom such property was acquired. * * * The testimony, however, is that the records of Chateau were kept on a computer system and the computer printout did show the section 179 property on which Chateau claimed first year depreciation. The testimony was that the Revenue agent declined to look at the computer printout when investigating the Chateau partnership return. All other requirements necessary in claiming first year depreciation were complied with by Chateau. The property on which Chateau claimed first year depreciation was tangible property property acquired by purchase during 1971 for use in Chateau's trade or business, which Chateau determined to have a useful life of 6 years at the date of acquisition *704 ( section 1.179-3, Income Tax Regs.). Chateau did elect on its return to take first year depreciation and the return indicates that the property on which the first year depreciation was elected was not included in the depreciation under section 167 claimed on the return. Chateau had records of the personal property with respect to which first year depreciation was claimed. The Revenue agent in his report identified some such property. Also, the very fact that apartments were rented and the rented apartments, according to the testimony of several witnesses, contained appliances, drapes and carpeting, shows that Chateau had personal property in 1971 on which it could properly claim first year depreciation. On the state of this record, we conclude that respondent has failed to show that Chateau was not entitled to the first year depreciation claimed. The total amount of the items conceded by respondent plus the items heretofore discussed that respondent has failed to establish should be used to increase petitioner's income is § 32,575. On this record respondent has therefore failed to show that there was any underpayment of tax by petitioner in the year *705 1971. Respondent in his brief, however, contends that-- even if there is no actual deficiency redetermined to be due from the petitioner in 1971, his fraudulent acts in that year result in an overstated 1971 loss and, thus, an overstated carry back to 1968, which produces a deficiency due to fraud from the petitioner for the year 1968. * * * The only authority respondent cites for this contention is Rev. Rul. 60-215, 1960-1 C.B. 642. This Revenue Ruling deals only with the addition to tax for fraud under section 6653(b) in a year to which the loss is carried and not with the question of whether that year is open for assessment of a deficiency. Respondent in his brief does not discuss section 6501(h) or its relationship to the opening of an otherwise closed year.
Section 6501(h) provides that-- In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback or a capital loss carryback (including deficiencies which may be assessed pursuant to the provisions of section 6213(b)(2)), such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the *706 net operating loss or net capital loss which results in such carryback may be assessed. * * * under this section the question is whether the statute had expired for the year 1971, which clearly it had absent fraud.
Before deciding whether under the facts in this case of no tax due by petitioner for 1971 the provisions of section 6501(h) and section 6501(c) could properly be interpreted to cause the year 1968 to be open, we will examine whether respondent has shown sufficient omissions or improper deductions by petitioner in 1971 to result in petitioner's loss for that year being less than the $ 10,333 needed as a carryback to 1968 to cause some deficiency in tax for that year.In making this determination we do not start with the $ 23,896.31 loss as shown on petitioner's return used in respondent's computation for 1971 but with the $ 16,083.40 of adjusted gross income loss. We must start with this figure because section 172(d) provides that in computing the net operating loss for the year from which it is to be carried back deductions for personal exemptions shall not be allowed and deductions not attributable to the taxpayer's trade or business shall be allowed only to the extent *707 of the amount of gross income not derived from such trade or business. Certainly there would be some allowance of deductions under this provision in computing the loss carryback since apparently petitioner reported some non-trade or business income. However, we will analyze the various adjustments made by respondent and what he has established to determine if we need to reach the point of the exact computation of any loss carryback from the year 1971.
The items with respect to which there is the most evidence to support respondent's position in this record are the adjustments made by respondent to the return of Norlang resulting in an adjustment to the loss claimed by petitioner from his interest in that partnership. We will therefore consider whether respondent has shown that petitioner in fact did have $ 9,000 of unreported fees from Chateau and the extent to which he has shown overstatement of the loss of B & L in 1971. The evidence in the record is clear that petitioner was a partner in Chateau and that he handled the financial aspect of Chateau' operation and oversaw the keeping of Chateau's books. The record shows that J. Blair Jones, along with petitioner and three doctors, *708 Drs. Paul Naisbitt, Byron Naisbitt, and Evan Evans, originally formed the Chateau partnership in early 1971. Mr. Jones was a contractor and it was understood that he would oversee the building of the apartments. There was no written partnership agreement but it was Mr. Jones and petitioner who primarily put time and effort into partnership activities. Because of disagreements between petitioner and Mr. Jones, which began around the first of September 1971, Mr. Jones withdrew from the partnership around the first of November 1971. Mr. Jones testified that sometime after construction got under way on the apartments in March 1971 it was agreed that he and petitioner would take draws from the partnership and that the initial draw would be $ 1,000 each because of work they had done making the plans for building the apartments and obtaining the finances, and that thereafter Mr. Jones would draw $ 1,500 a month and petitioner $ 750 a month. The record shows that on March 4, 1971, Mr. Jones was given a check by Chateau for $ 2,500 and at around the beginning of each month from April to October he was given a check from Chateau for $ 1,500, making a total of $ 13,000. The record shows *709 that these amounts were treated by Chateau as draws and not deducted or capitalized by Chateau was either an expense or as an additional cost of the buildings. Mr. Jones testified that when he withdrew as a partner on November 1, 1971, he had a settlement with respect to his partnership interest. The record shows that a check for $ 750 was issued to petitioner on April 1, checks for $ 1,000 and $ 750 were issued to petitioner on April 13, and a check for $ 500 was issued to him on April 15, 1971, by Chateau. Petitioner was then issued a check for $ 750 by Chateau around the first of each of the months of May through December with the exception of the month of September. The record also shows that these amounts were treated on the partnership books as draws by petitioner and charged on the Chateau books against his partnership account. Our outline of the facts above is all that the record in this case shows.Respondent, however, argues that the amounts received by petitioner from Chateau should properly be held to be income to petitioner under the provision of section 707(c). Section 707(c) deals with guaranteed payments to partners and provides that "to the extent determined *710 without regard to the income of the partnership, payments to a partner for services * * * shall be considered as made to one who is not a member of the partnership * * *." There is nothing in this record to show whether the amounts designated on the books of Chateau as draws were "determined without regard to the income of the partnership." Respondent's argument in this regard is that this fact should be assumed since until approximately September of 1971 Chateau had no income. In our view, respondent's assumption is unwarranted. The amounts were treated on Chateau's books as draws and so entered in petitioner's partnership account. This would indicate that the amounts were not without regard to income. Certainly there is nothing in section 707(c) that indicates that "without regard to income" means the income of the current month of the draw. Since Chateau had no written partnership agreement, the nature of these payments would depend on the oral partnership agreement. The one partner who testified, J. Blair Jones, indicated in his testimony that the amounts both he and petitioner received were draws. No testimony was produced from the other three partners. Clearly the nature *711 of the services that petitioner was rendering to Chateau was the type of services a partner would be expected to render to his partnership. They were general management and overseeing services. See Pratt v. Commissioner,64 T.C. 203 (1975), affirmed in part and remanded 550 F.2d 1023 (5th Cir. 1977). On the basis of this record, we conclude that respondent has failed to establish that the $ 9,000 received by petitioner from Chateau in 1971 was income to petitioner. Respondent has also failed to produce evidence sufficient to support most of his adjustments to the 1971 partnership loss reported by B & L. The record shows errors in the partnership return of income of B & L for 1970, but that year is not involved in this case. For the year 1971 the evidence is insufficient to support the adjustments made by respondent to depreciation and his disallowance of part of the claimed interest deduction. The depreciation adjustment resulted partially from a reallocation of basis between buildings and personal property.This reallocation was made on the basis of a tax assessment on personal property without any showing of how the valuation of the personal property *712 for tax purposes was made or its accuracy. The balance of the depreciation adjustment was due to a change in the useful life of the property. The evidence in this respect is meager and respondent relies primarily on the presumption of correctness of his notice of deficiency which is not sufficient to carry his burden of proof. The amount of prepaid interest is recited in the contract for purchase of the apartments. There is no showing in this record that all parties to the contract did not treat this payment as interest. The correctness of some other minor adjustments made by respondent have not been shown by the evidence to be correct. We therefore conclude that respondent has failed to show that petitioner did not have a loss carryback from 1971 in the amount of his reported 1968 income. Because we have concluded that respondent has failed to establish an underpayment of tax by petitioner or a deficiency in petitioner's tax in either the year 1971 or 1968, we find it unnecessary to discuss whether the returns signed by petitioner on behalf of Norlang and 88th East were false and fraudulent or to reach the issue of whether petitioner's personal return for 1971 fraudulently *713 reported any items.
Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. In the stipulation filed in this case respondent conceded that none of the $ 589 listed as unexplained deposits in the Davis County Bank Acct. 8260 were properly includable in petitioner's income and that $ 310 of the $ 510 deposits in the Davis County Bank Acct. 7998 was not income, and that $ 13,510.27 of the amount shown in the deficiency notice as unidentified deposits in the Davis County Bank Acct. 101-10522-12 was either not income to petitioner or consisted of items which he had included in petitioner's income in his determination of unreported fees.Of the remaining amount, $ 363.51 consisted of a refund petitioner received from his 1970 State income tax.↩
3. Respondent conceded that $ 209.10 of the amount shown as fees to petitioner from Chateau partnership were not in fact fees or income to petitioner. The remaining $ 9,000 represented checks drawn to petitioner by Chateau which were shown on Chateau's books as a partnership draw.↩
4. In order for respondent to show any underpayment of tax by petitioner for 1971 he must show sufficient incorrect items to overcome petitioner's reported loss of $ 23,896.31. Since respondent made adjustments to petitioner's income, aside from the allowance of the charitable contribution deduction of $ 54,977.80 for the year 1971, if the record shows that respondent has failed to substantiate $ 31,081 or more of his adjustments he has failed to carry his burden as to that year.↩
5. In Brown v. Commissioner,T.C. Memo. 1968-29, affirmed per curiam 418 F.2d 574 (9th Cir. 1969), we stated this principle as follows: The general guidelines are familiar ones. Respondent has the burden to prove fraud for each year. Section 7454, Internal Revenue Code of 1954.To carry this burden requires proof by clear and convincing evidence of intentional wrongdoing with the specific purpose of evading a tax believed to be owing. The test is the intent at the time the return is filed, not some earlier or later date. Harry Gleis [Dec. 21,204], 24 T.C. 941 (1955), affd. per curiam [57-1 USTC par. 9451] 245 F.2d 237 (C.A. 6, 1957); Estate of William Kahr [Dec. 28,617], 48 T.C. 929 (1967). But intent alone is insufficient, for fraud requires both intent and action. If the taxpayer intends to defraud the Government, but his return is inadvertently correct, he cannot be found liable for fraud. If there is no deficiency there is no fraud. Jenkins v. United States [63-1 USTC par. 9289], 313 F.2d 624, 627 (C.A. 5, 1963); Elfmon v. United States [54-1 USTC par. 49,017], 209 F.2d 642, 643 (c.a./ 4, 1953); In re Parr [62-2 USTC par. 9708], 205 F.Supp. 492, 496↩ (S.D. Tex. 1962). However, if any part of the deficiency is due to fraud, then the penalty attaches to the total deficiency. * * *